[Crim. No. 13704. Second Dist., Div. One. June 10, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT DANIEL DE ARKLAND et al., Defendants and Appellants.

806

Edward B. Stanton and William O'Neil Carlisle for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and William V. Ballough, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from judgments of robbery.

In an information filed in Los Angeles on October 28, 1966, in count I each of the defendants was charged with robbing Douglas Parker on September 29, 1966, of certain personal property. It was also charged that defendants were armed with deadly weapons at the time of the commission of the offense. In count II each of defendants was charged with kidnaping for the purpose of robbery in that they did kidnap and carry Douglas Parker in order to commit robbery on September 29, 1966. It was also charged that defendants were armed with deadly weapons at the time of the commission of the offense and that De Arkland was armed with a concealed deadly weapon at the time of his arrest. Each defendant pleaded not guilty to each count. In a jury trial it was found that each defendant was guilty of robbery as charged in count I of the information; that each defendant was armed at the time of the commission of the robbery. Each defendant was found not guilty of the kidnaping charge. Each defendant was sentenced to the state prison. A timely notice of appeal from the judgment with reference to each defendant was filed. A purported notice of appeal from an order denying a motion for a new trial was also filed.

A résumé of some of the facts is as follows: At around noon on September 29, 1966, Douglas Parker, owner of the Continental Coin Company, was seated at his desk in the front of his North Hollywood store when appellants De Arkland and Kenney entered. Neither of the men was masked; De Arkland, who remained near the front door, had a small black moustache. Kenney, attired in continental trousers and low boots and wearing a glove on one hand, approached Parker who looked up and inquired, "May I help you?" In response Kenney pointed a gun at Parker, who was then only about 4 feet away, said, "Don't move; stay right where you are. I've done this four times before," and ordered him to open the safe. When Parker answered that the safe was unlocked, De Arkland walked around behind the counter to the entrance to the store's back room and Kenney, still on the other side of the desk with his gun pointed at Parker, ordered him into the back room. Parker passed close to De Arkland, also armed, who ordered him to lie down on the floor and not move, then tied him up. Parker told the robbers that he didn't carry a gun, but he expected his partner to return to the store at any minute. Shortly thereafter Don Clark entered the store to deliver some stamp catalogues; Kenney waited on him and

agreed to see that Tim Frein would receive the catalogues as requested. Parker, who was lying near the back door, then heard coins clinking together and felt a heavy object, probably a bag, being dragged over his legs. Finally, the robbers departed through the back door and he heard a car start and drive away. Before long a customer found and untied Parker who immediately reported the robbery of $326 in cash and rare coins of $8,000 retail value to the police. Parker described De Arkland to the police as 40 years of age, medium complexioned, about 5 feet 7 with black hair and wearing a moustache, cap and black gloves. He described Kenney as about 30, male, medium complexioned, having dark brown hair and wearing olive pants and high black boots. He identified both from a selection of police photographs shown to him shortly after the crime.

At 5:45 p.m. on October 1, 1966, Officer Lester Clark, pursuant to a police teletype message received that day from the Los Angeles Police Department arrived at De Arkland's apartment with several other officers to apprehend De Arkland, who had been described as extremely dangerous. While Officers Kearns, Mulderrig, and Zine went up to the second floor apartment, Officer Clark guarded the stairs below. Upon the signal that De Arkland had been found, Clark went up to the apartment where he found the door open and De Arkland standing in the doorway in front of a woman. Lieutenant Mulderrig advised De Arkland that he and his companions were police officers and that De Arkland was under arrest for armed robbery and kidnaping. Then Officer Clark and two other officers entered and searched the apartment in which they found a collection of coins, an unloaded .22 Ruger revolver, and a black attaché case containing a loaded .32 caliber Brescia automatic pistol and a .25 caliber Browning automatic.

Although the officers had no arrest warrant, they based De Arkland's arrest upon teletype information from Los Angeles identifying De Arkland. In the police lineup Parker immediately identified De Arkland on the day he was apprehended. He also identified De Arkland and Kenney in court at the trial, and he identified the .32 caliber automatic from nicks or scratches on the barrel which he had noticed at the time of the robbery. Parker's customer, Donald Clark, also identified Kenney at the trial as the individual to whom he had handed the catalogue on the day of the crime.

William A. Clark, who was the manager of the Sacramento apartment house where De Arkland had been residing prior to

the robbery, testified that on September 27 or 28, 1966, De Arkland said he would be in Los Angeles over the next few days. De Arkland's apartment was above and adjacent to Clark's apartment. Although Clark was at home all evening September 28 and all but a few hours on the evening of September 29, he did not see De Arkland on either evening.

Numerous defense witnesses testified in an attempt by defendants to establish the alibi that they were in Sacramento during the period when they allegedly were in Los Angeles committing the charged crime. The accuracy of the defense witness' time-recollections was frequently uncertain and their credibility stood against the clear and positive identifications made by the victim, Parker, and his chance customer, Donald Clark.

Patrick Kenney, appellant Kenney's 18-year-old brother, lived with Kenney and his wife. He testified that Kenney was at home all day on September 28, except for about an hour when he visited De Arkland's apartment, and that Kenney also spent that night at home. De Arkland testified that on the morning of September 28 he arose, checked his mail and went shopping. When Kenney came over later they drove to Auburn in an unsuccessful attempt to find David Loux, then returned promptly. That evening De Arkland thawed a large chunk of liver at his apartment and, keeping a few slices for himself, gave it to a friend, Jeanette De Hart, manager of an adjoining apartment building, who recalled the incident. Later De Arkland visited Kenney's home and upon his return De Arkland went out on his second floor apartment balcony and talked to Robert Winger and Rick Clark, who were beside the pool below. Winger, who was a neighbor of De Arkland's, recalled seeing and speaking to De Arkland at about 8 p.m. on September 28.

On September 29, the day of the crime charged, Kenney went to De Arkland's apartment immediately after breakfast. On the way there, he noticed a new apartment building nearby and talked to the manager, Feren Branum, and even attempted to place a deposit on one of the apartments, although the building was incomplete. Mrs. Branum testified that she recalled his visit. She claimed that she refused his proferred deposit because it was too soon and she had no rent schedules, but Kenney mentioned seeing a diagram containing such schedules in the lobby.

In any event, Kenney proceeded on to De Arkland's apartment where he met his codefendant and they drove out to the

Sierra Pre-Casting Company plant near Auburn, California, to leave there some plans for a proposed marina real estate development. When they arrived at the plant, De Arkland discovered that he had forgotten some pictures, so the men returned to De Arkland's apartment to obtain those photographs. Before they left his apartment again, at about 1:30 p.m., De Arkland, who was an operating engineer, received a call from Herman Eppler, dispatcher for the union local, that he had a job for a bulldozer operator, which De Arkland declined. Eppler's "work order sheet" for September 29, 1966, showed that he received a call from a contractor about 1:30 p.m. ordering a member who could operate a bulldozer, and because De Arkland was the first man on the list in this specialty, he was called first. The "out of work list" showed a call to De Arkland on September 29 and before the date the symbol "R" appeared while after the date was marked the symbol "NA." Eppler attempted to explain the ambiguity, testifying he had already written "NA" for "no answer" before De Arkland answered the call and refused the job, so he then wrote "R" for "refused" before the date.

Kenney and De Arkland claimed that they then returned to leave the pictures at the Sierra Pre-Cast plant. Siegfried Goepner, an employee of the company, said he saw De Arkland in the yard about 2 or 3 p.m. that day asking for the owner, Mr. Santoni, and he recognized Kenney who had been seated on the passenger side of De Arkland's automobile when he drove up. De Arkland introduced himself and was told Santoni was away, so he left the plans and pictures in Santoni's office. Goepner gave the matter small attention because he had just discovered that a load of concrete had been ruined by the addition of too much water. Fred Santoni testified that he saw De Arkland and another man in De Arkland's car which passed him that afternoon between 12 and 2 p.m. on the road about a half mile from his plant, headed toward Sacramento. He found the plans and pictures upon his return to his office the same day, which he also recalled by reference to the ruined batch of cement. However, Santoni's diary, which reflected most of the days Goepner worked, failed to show that he worked September 29.

Appellants returned to De Arkland's apartment where they discussed the proposed development further and then Kenney went home, where his brother and wife testified they saw him at about 3 p.m. At about 5 p.m. Jeanette De Hart knocked on De Arkland's door and offered him a bottle of vodka, which

he declined. De Arkland called his girl friend, Duane "De-De" Gilmour, around 7 p.m. but she wasn't home. Thereafter David Loux and Kenney came over and the three had dinner together, then stopped and had a couple of drinks at a local bar. De Arkland got home by about 11 p.m. and near midnight he received a collect phone call and spoke to the caller, DeDe.

In his testimony De Arkland denied that the weapons found in his apartment belonged to him and said he had not known that they were there. He further testified that he was an avid coin collector and owned an extensive collection of coins. David Loux, a friend who had a key to De Arkland's apartment, testified that he had placed in a closet at De Arkland's apartment about a week before the crime the .22 caliber Ruger and the attaché case containing the two guns, gloves and other objects, without mentioning these items to his friend. Loux' testimony that he purchased one of the guns from George Keller in 1963 was corroborated by Mr. Keller, but he was unable to authenticate the purchase of the other weapons. Dorothy Miller, testifying in rebuttal, identified the Ruger pistol as one belonging to her husband by comparing the serial number in her records with the serial number on the pistol. She recalled that the weapon was in the drawer beside her husband's bed at about 7:30 a.m. on January 6, 1966, when he went to work. She went shopping that day and when she returned all of the furnishings had been removed from her home and the gun, among other things, was missing. She did not give De Arkland permission to remove the weapon.

Appellants make the following contentions: (1) that the prosecution improperly attempted to impeach the character of a defense witness, David Loux, by inquiring about a prior act of misconduct; (2) that the court improperly admitted Dorothy Miller's testimony concerning the theft of her personal belongings, including her husband's .22 Ruger; (3) that the prosecution's inquiry concerning De Arkland's prior conviction was prejudicial; (4) that the prosecution placed undue emphasis on the fact that certain evidence was obtained from another pending criminal case to appellants' prejudice; (5) that the prosecution improperly referred to the subject matter of one of Kenney's prior convictions and the court improperly admitted the indictment pertaining thereto; (6) that the judge committed prejudicial error in examining witnesses and making comments which indicated improper bias; (7) that the court erred in refusing to allow appellants to inquire concern-

ing the existence of an informer; (8) that because the jury failed to determine the degree of the crime, it must be found to be robbery in the second degree; (9) that the case was so closely balanced that the alleged errors require reversal.

Appellants first contend that the prosecution attempted to impeach the character of defense witness David Loux by improper questions concerning a prior act of misconduct. Loux testified that he left his .22 Ruger and the other guns admitted in evidence in De Arkland's apartment sometime about the middle of the week and he also specified the time when he had purchased each gun. The defense claimed that the guns used in the robbery belonged to Loux, that Loux was a good friend of De Arkland's and had been in his company on the day of the crime. Although Loux later testified that he left the guns at the De Arkland apartment on Thursday of the week *prior* to the robbery, it was reasonable for the prosecution to assume and to inquire whether Loux' testimony was biased because he was in some manner implicated in the robbery. When the district attorney inquired ''Did you commit any robberies with those guns?'' Loux responded emphatically that he did not. The court promptly admonished the jury to disregard the improper questions and later ruled correctly that since the jury was admonished and the answers were harmless, the questions were not prejudicial. (*People* v. *Brown,* 168 Cal.App.2d 549, 554 [336 P.2d 1]; *People* v. *Sorrentino,* 146 Cal.App.2d 149, 163 [303 P.2d 859].) ''An answer to an improper question that is favorable to the defendant is a complete reply to a claim of prejudicial error in asking the question.'' (*People* v. *Bigelow,* 104 Cal.App.2d 380, 386 [231 P.2d 881].)

Appellants next contend that by Dorothy Miller's testimony the prosecution attempted to impeach both De Arkland and Loux by proof of prior criminal conduct, but that the testimony was neither impeaching nor sufficient to establish that the Ruger had been stolen. De Arkland testified that he knew nothing about the weapons found in his apartment by the police and that they did not belong to him. Loux testified that the guns were his, that he left the weapons in the De Arkland apartment, and that he bought the Ruger in San Francisco in January of 1966. The prosecution thereafter called Mrs. Dorothy Miller to testify in rebuttal that the Ruger belonged to her husband, as indicated by the recorded serial numbers, and that she saw the gun in the drawer beside her husband's bed after he left for work at 7:30 on the morning of January 6, 1966. She discovered it missing, along with

practically "everything in the house," when she returned home from a shopping trip. She had given no one permission to take the gun, which established that its loss was the result of a criminal agency. (*People* v. *Jordan,* 204 Cal.App.2d 782, 786 [22 Cal.Rptr. 731].) The court observed of her testimony that "Certainly it shows very strongly that the gun was a stolen gun" and ruled that the question whether it impeached Loux' testimony was for the jury to determine. There is nothing in the record to suggest that the prosecutor's motive for introducing Mrs. Miller's testimony was anything other than to rebut the testimony of De Arkland and Loux, and for this purpose it was properly admitted.

█ Appellants contend that the prosecutor's error in asking De Arkland if he had been convicted of armed robbery and assault on a police officer, when he had in fact been convicted of assault with an offensive weapon with intent to rob, constituted prejudicial misconduct. █ It is the prosecution's prerogative to question a witness orally concerning a prior felony conviction (*People* v. *Allen,* 189 Cal.App.2d 706, 710 [11 Cal.Rptr. 440] ; Evid. Code, § 788) so long as the examination is in good faith. (*People* v. *Perez,* 58 Cal.2d 229, 238 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946] ; *People* v. *Linyard,* 151 Cal.App.2d 50, 55 [311 P.2d 57].) █ Although the question was in this instance improper, it was the result of the prosecutor's misreading of his information sheet, and the court carefully admonished the jury to disregard the question because there was no evidence in the case that De Arkland was ever convicted of assault on a police officer. The court properly ruled that the question, which was an inadvertent error, had been propounded in good faith; that the jury had been admonished to disregard it; and that it was not prejudicial under these circumstances, especially because it was denied by the defendant. (*People* v. *Hays,* 250 Cal.App.2d 373, 378 [58 Cal.Rptr. 293].)

█ Appellants further contend that the prosecutor repeatedly referred to a pending case in connection with the Ruger pistol and De Arkland's 1950 Kentucky judgment of conviction, which resulted in prejudice. Both the gun and the judgment of conviction were obtained by the prosecutor from a pending municipal court case where they had already been received in evidence. The record reflects that no unnecessary reference was made to the pending municipal court case, no reference was made to the name of the defendant in that case, and no objection was made to the procedure of introducing

gun and judgment by reference to the pending case number, nor was any alternative procedure suggested by defense counsel. There is no indication that the jury attributed to this matter any greater significance than it did any other purely procedural event. The conclusions that may have been drawn by the jury from this procedure are purely speculative and prejudice may not be presumed in the absence of additional facts.

Appellants contend that the district attorney's question regarding Kenney's prior felony conviction improperly delved into the details thereof because he inquired whether Kenney did not plead guilty to possession of a sawed-off shotgun, and appellants further claim that the indictment was improperly introduced. The prior felony conviction took place in the federal court in May 1966. The offense with which Kenney was charged was possession either of a shotgun with a barrel less than 18 inches or of a rifle with barrel less than 16 inches, items frequently described as "sawed-off" weapons. The record shows that Kenney pleaded guilty to an unspecified offense, and it was therefore proper for the prosecutor in the present trial to refer to the sawed-off shotgun to ascertain the nature of the offense of which Kenney was convicted. (*People* v. *Tabb*, 137 Cal.App.2d 167, 171 [289 P.2d 858]; *People* v. *Peete*, 28 Cal.2d 306, 320 [169 P.2d 924].) In fact, the term "sawed-off shotgun" is not prejudicial in and of itself, and has a well-established meaning in California law. (Pen. Code, §§ 12001.5 and 12020.) The prosecution introduced the following documents dealing with Kenney's prior conviction: the first page was the jacket cover, the second page was the indictment; the third page was the certification of the indictment; and the fourth page was the court's minute order reflecting the guilty plea. Defense counsel at the trial conceded the minute order was properly introduced, and that the certification was superfluous. Only on appeal is the contention made that all pages except the jacket cover were inadmissible. This claim cannot be substantiated since the jacket cover alone has no significance, is not a legal document, and does not reveal the nature of the offense. In this case the indictment is essential to reflect the nature of the offense because the minute order does not specify the crime to which Kenney pleaded guilty. Since none of these documents contains any prejudicial information concerning defendant Kenney, and no objection was made by his counsel at the trial, we find nothing prejudicial in the introduction of this material.

 Appellants next contend that the court's examination of certain witnesses and its comments concerning the credibility of selected witnesses' testimony constituted prejudicial misconduct depriving appellants of a fair trial.

 It is, however, well established in the decisions of this state, that the trial judge may make fair comment on the evidence. "It seems clear from the use of the word 'comment' in section 19 of article VI [of the Constitution] that a trial judge is empowered to do more than merely summarize the evidence and that he may analyze the testimony critically, giving his opinions for the guidance of the jury." (*People* v. *Friend*, 50 Cal.2d 570, 576 [327 P.2d 97].)

 "A judge's power to comment on the evidence, of course, is not unlimited. [Citations.] He may not withdraw material evidence from the jury's consideration or distort the testimony, and his comments should be temperately and fairly made, rather than being argumentative or contentious to a degree amounting to partisan advocacy. The jury, as required by the constitutional provision, must remain as the exclusive arbiter of questions of fact and the credibility of witnesses, and the judge should make clear that his views are not binding but advisory only." (*People* v. *Friend, supra*, pp. 577-578.) We observe that the court in the present case fully and conscientiously explained its limitations and admonished the jury concerning its own responsibility to make an independent examination of the evidence and a final decision concerning the facts and the proper inferences to be made therefrom.[1] The court's comments constituted merely a lucid recitation and summarization of some of the salient facts.

 Although appellants claim that the judge's comments concerning the credibility of selected testimony lent such tes-

---

[1] ". . . a Judge may comment but he must do so in a manner which is completely dispassionate, objective and fair. He must not assume the role of an advocate for one side or the other. He must be a completely strict, neutral arbiter in his comments. If he does assume the role of an advocate and is unfair in his comment, if there is a conviction it can be reversed for misconduct on the part of the trial Judge.

"There have been occasions when I have commented to the jury on the evidence and the credibility of witnesses, and I only do so when I feel that such comments may possibly be of some aid to the jury in reaching their verdict.

"I intend to make a few comments in this case. In making these comments I want to say preliminarily that it is not necessary for you to follow any of these comments. You are not to infer from any of them that I have an opinion of the defendant or either of them as to their guilt one way or the other.

"You may reject the Court's comments entirely or partly or accept them. If they are of any aid to you, you may of course accept them. If

timony misleading emphasis, it is clear also that the judge is not required to sum up all the testimony, but may restrict his comment to portions of the evidence or to the credibility of a single witness. (*People* v. *Friend, supra,* 50 Cal.2d 570, 577-578; *People* v. *Ivy,* 244 Cal.App.2d 406, 409-410 [53 Cal.Rptr. 47].) None of the language used by the court in the present case remotely approaches the objectionable comments related in the case relied upon by appellants (*People* v. *Frank,* 71 Cal.App. 575, 579-580 [236 P. 189]) where, because the witnesses were not present and subject to cross-examination at the trial, the jury was unable to observe their demeanor and could evaluate their credibility only by reference to the judge's comments in reading transcripts of the testimony.

 Appellants further contend that the length of the court's examinations of some defense witnesses, and the questions asked, demonstrate that the judge assumed the role of prosecutor. In fact, the record discloses that the court, once assured that both prosecutor and defense counsel had completed their examination of the witness, frequently asked questions calculated to clarify ambiguities and render the witnesses' responses more explicit. Following the cross-examination of the first and key prosecution witness, the court addressed the jury: "I have a few questions, and, ladies and gentlemen, I will probably ask a few questions from time to time of the witnesses. I usually do after counsel have completed their examination, but I want to admonish you that you are not to draw any conclusions at all from my questions that I may ask as to the veracity of the witness or draw any conclusions as to what the Court might think or believe as to the guilt or innocence or his veracity." The court further invited the objections of counsel to any questions either might consider improper and advised the jury to draw no inferences from such objections. Appellants' counsel, with ample opportunity to object, made no objection to any individual question

_____

you feel they are not, please feel free to reject them. Because as I have told you before, you are the sole and exclusive judges of the facts in the case and I am not. I am only the Judge of the law in this case.''

''. . . . . . . . . . . .

''As I say, I have commented to some extent on the evidence. I am through. I reiterate again: Anything I have said here is to be considered and was intended only to guide you or help you, suggest to you certain matters and not as an effort to influence you in any way, to point out things that might be taken into consideration by you. And, if you think that the Court's remarks have been helpful, use them; if you do not, ignore them. You are at liberty to do anything you want in this case. You are the sole arbiters of the facts in this case and you are the ones that will have to decide it, not me.''

or line of questioning engaged upon by the court with any witness. He expressed general disapproval of the court's questioning after the complained-of examination of eight witnesses had been completed, and he made no objection during the court's questioning of the ninth witness. The Court's procedure and the questions asked of each witness were completely proper as an attempt more closely to approach the truth. (*People* v. *Anderson,* 199 Cal.App.2d 510, 518 [18 Cal. Rptr. 793]; *People* v. *Rigney,* 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186]; *People* v. *Baldwin,* 223 Cal.App.2d 720, 730 [36 Cal.Rptr. 40].) ▇▇ Moreover, by failure to object to the questioning as it occurred, appellants waived their right to complain of any defects in these questions upon appeal. (*People* v. *Corrigan,* 48 Cal.2d 551 [310 P.2d 953].) ''There is no claim that the questions asked . . . constituted improper cross-examination as far as the subject matter was concerned. The position of . . . [appellants] is that the length of the examination by the judge and some of the language which he used conveyed to the jury the impression that he did not believe the witnesses. No objection was made to any of the questions, and, . . . [appellants] cannot complain on appeal where, as here, any error could have been corrected, if a timely objection had been made. Moreover, we find no error in the questioning of these . . . witnesses. The judge was obviously seeking to elicit or clarify testimony on material points, and it is the right and the duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence. [Citations.] ▇▇ The mere fact that the judge examined . . . [specific witnesses] at some length does not establish misconduct. [Citation.]'' (*People* v. *Corrigan, supra,* 48 Cal.2d 551, 559.)

▇▇ Appellants contend that De Arkland's arrest was made on information supplied by an informer and that their conviction should be reversed because the court refused to allow appellants to inquire as to the possible existence of such an informer. Appellants base this contention on the fact that police appeared to have information concerning them which supplemented or modified that information supplied by the robbery victim and that, therefore, there must have been an informant. However, the mere fact that the police had photographs or ''mug'' shots of both appellants is evidence from which it may safely be inferred that the police had collected information concerning each of them as a result of previous investigations, and once they were suspects in the present

case, further information would have been accumulated by police investigation. The court properly refused appellants exploratory questioning on the basis that no proper inference could be drawn that an informer in fact existed.

Appellants finally contend that the court erroneously fixed the degree of the robbery as first degree based upon the jury's special verdict that each of the appellants was armed with a deadly weapon at the time of the robbery. Appellants were charged with robbery and with being armed with deadly weapons at the time of the commission of the charged offense. The jury found appellants "Guilty as Charged" and further found, by special verdict that appellants were armed as alleged in the information. By their special verdict, the jury unequivocally and unquestionably found the facts requisite for a finding of first degree robbery.[2]

In the absence of a jury verdict determining the degree of a crime distinguished in two degrees the degree of the crime is generally deemed to be the lesser degree. (Pen. Code, § 1157.) The court, in the present case, however, confronted the dilemma that the jury's special verdict, which found that each defendant was armed with a dangerous weapon when the crime was committed, was in direct conflict with a conviction for second degree robbery. Moreover, a judgment failing to specify the degree of the crime would be considered void for uncertainty with relation to the sentence. (*In re Colford*, 68 Cal.App. 308 [229 P. 63].) The court therefore entered a judgment, consistent with the verdicts and special verdicts rendered by the jury in the present case, convicting appellants of first degree robbery. The form of

---

[2] In the Superior Court of Los Angeles County the clerk types the forms of verdicts to be presented to the jury and when the crime charged is divided into degrees, the clerk types in after the language reflecting guilt or innocence, and the further provision "And find the offense to be in the ——————— degree." Through inadvertence, the verdict forms supplied to the jury in the present case did not contain the provision above by which the jury could, by insertion of the word "first" or "second" find the defendants guilty of the crime in either degree, and the jury failed to indicate their determination of the degree as required by Penal Code section 1157. The jury did, however, render its special verdict determining that each of the defendants was, at the time of the commission of the offense charged, armed with a deadly weapon as alleged by information, as required by Penal Code section 1158a. These verdicts were read by the jury foreman in open court with both counsel and the defendants present; no objection was made to the form of the verdicts, or any of them. Only after the discharge of the jury did it come to the attention of the court that the jury's verdict was technically deficient for failure to specify the degree of the crime, which has been held to be the exclusive province of the jury. (*People* v. *McNeer*, 14 Cal. App.2d 22 [57 P.2d 1018]; *People* v. *Mahatch*, 148 Cal. 200 [82 P. 779].)

the verdict is regarded as immaterial so long as the jury's intention to convict of the crime charged under the allegations of the information is unmistakably expressed. (*People* v. *Flohr*, 30 Cal.App.2d 576, 581 [86 P.2d 862].) ▮▮▮ The trial court based the judgment of conviction on the jury's implied finding that the crime constituted robbery in the first degree, a procedure which we consider eminently appropriate and correct under the circumstances.

▮▮▮ Appellants finally contend that the case was a closely contested matter because the jury stood at nine to three after two days of deliberation, because they deliberated for three days, made "repeated requests" for both testimony and explanation by the court, and because the testimony of the witnesses was "sharply conflicting." Insofar as the three dissenting jurors are concerned, one was a woman who impeded the jury's progress because for a period she felt physically or emotionally unable to continue, but who finally resolved her medical problem and was able to conclude her deliberations on the evidence effectively. The other two were women who merely wanted to examine and talk about the evidence at greater length. The only testimony read to the jury was that of the robbery victim and that of his customer, Donald Clark, which dealt with the identification of appellants. Considering the fact that the trial consumed two weeks, involved the conflicts of testimony inherent in an alibi defense, and included one juror whose presence somewhat impeded the jury's progress, the circumstances pointed out by appellants do not indicate close balancing. In fact, the evidence points to a strong prosecution showing with positive eyewitness identification of the perpetrators of the crime which could not be overcome by numerous, friendly witnesses for the defense. We find no basis for reversal in the record before this court.

The purported appeal from the order denying the motion for a new trial is dismissed.

The judgment is affirmed as to each appellant.

Wood, P. J., and Lillie, J., concurred.