[Crim. No. 16384. In Bank. Jan. 4, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE LEE BEAMON, Defendant and Appellant.

626

## COUNSEL

Willie Lee Beamon, in pro. per., and Robert A. Scott, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, William R. Pounders and Geoffrey S. Cantrell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—Willie Lee Beamon appeals from a judgment following jury convictions of robbery (Pen. Code, § 211) and kidnaping for the purpose of robbery (Pen. Code, § 209).[1]

 ██ ██ Defendant was charged with and found to have been armed with a deadly weapon at the time of the commission of each offense.[2] The jury further found that the victim did not suffer "great bodily injury" in connection with the robbery (see § 213), but that he did suffer "bodily harm" in connection with the kidnaping committed for the purpose of such robbery (see § 209). Defendant waived his right to a jury trial on the penalty phase of the kidnaping charge (see §§ 190.1, 209) and submitted such penalty issue on the proceedings had at the trial on the guilt phase. The trial court determined that "the penalty to be imposed will be life imprisonment without possibility of parole."

On a motion for a new trial the prosecutor and defense counsel stipu-

---

[1] Unless otherwise indicated, all section references are to the Penal Code.

[2] Although the jury found that defendant was armed with a deadly weapon at the time of the commission of the robbery it failed to apply such finding to fix the degree of that crime. (See § 211a.) Section 1157 directs that when a defendant is convicted of a crime which is distinguished into degrees the finder of fact "must" find the degree of the crime, and in the absence of such a determination the defendant "shall be deemed" to be guilty of the lesser degree. We cannot assume, contrary to the clear legislative direction, that because a factual finding was made which would have warranted a determination of first degree robbery, the jury unmistakably intended (see *People* v. *Flohr* (1939) 30 Cal.App.2d 576, 581 [86 P.2d 862]) to make that determination when it refrained from expressly fixing the degree. The degree of the crime must, in accordance with the statute, be deemed to be of the second degree. Anything to the contrary in *People* v. *Doran* (1972) 24 Cal.App.3d 316 [100 Cal.Rptr. 886]. and *People* v. *De Arkland* (1968) 262 Cal.App.2d 802 [69 Cal.Rptr. 144] is disapproved.

The finding that defendant was armed with a deadly weapon, "to wit, a handgun" would thus appear to be applicable for all purposes (see §§ 1203, 3024, 12022; *People* v. *Floyd* (1969) 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862]), but the trial court ordered that its applicability be limited to section 1203 relating to future violations, if any, by defendant. The court similarly limited the applicability of the finding of having been armed in the case of the kidnaping. There are, accordingly, no issues of minimum or maximum terms other than as provided for the basic crimes. (See §§ 209, 213.)

lated that the injuries received by the victim ". . . were such that [defendant] could receive the possibility of parole." Although the court denied the motion it nevertheless exercised its discretionary power (see § 1181, subd. 7) to revise the finding of bodily harm, stating that "for the purpose of sentencing I'll find that the victim in this case was not subjected to bodily injury." The judgment, however, fails to reflect the revised finding or the mitigating effect thereof.[3] We deem this failure to constitute a clerical error which we can and do correct. For reasons which hereinafter appear, we otherwise hold that defendant may not be punished for both the robbery and kidnaping for purpose of such robbery (see § 654), reject defendant's remaining contentions and affirm the judgment as necessarily modified.[4]

## The Facts

On July 2, 1970, in the early afternoon Gerald Ashcraft, the victim herein, parked his employer's truck for the purpose of making a delivery of liquor to a customer. The truck contained, after the delivery, merchandise worth about $2,500. When Ashcraft returned to the cab of the truck but before he started the motor defendant entered from the passenger side with a gun in his hand. Ashcraft was ordered to lie face down on the floor of the cab. Defendant took the keys from the victim's hand, started the motor and drove away.

After the truck had been driven a few blocks Ashcraft looked up at the driver. Eighteen months earlier he had suffered a similar highjacking and he now recognized defendant as the person who had been tried for and acquitted of criminal charges filed in connection therewith.[5] Defendant

---

[3]The judgment recites: "Whereas the said defendant having been duly found guilty in this court of the crime of ROBBERY (Sec 211 PC), a felony, and in the course of the Robbery, did not, inflict great bodily harm upon the victim as charged in Count 1 of the information and KIDNAPING FOR THE PURPOSE OF ROBBERY, in Violation of Section 209, Penal Code, a felony and that the victim was subjected by defendant to bodily harm as charged in Count 2; defendant having been found armed as alleged in each of the said counts; the Court fixed the penalty at life imprisonment, without possibility of parole.

"It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the State Prison for the term of his natural life, without possibility of parole, on said Counts."

[4]Although the judgment does not clearly indicate that defendant has been sentenced on both counts, it expressly appears from the reporter's transcript of the arraignment for sentencing that the "sentence in Count 2 [kidnaping] is to be served concurrently with the sentence imposed in Count 1 [robbery]." We thus treat the judgment as imposing concurrent sentences for the violations.

[5]At the earlier trial Ashcraft was unable to make a positive identification of defendant as the highjacker but, as a witness, had observed defendant during the five-day trial. Ashcraft had also seen defendant two or three times after the trial.

pointed the gun at Ashcraft's face, ordered him to "get back down" on the floor and stated that "this time" he would be killed.

Ashcraft returned to his position on the floor but moved his hand to take possession of a gun which he kept under the driver's seat and triggered a silent emergency alarm. At a time when he could see that both of defendant's hands were occupied with driving tasks, Ashcraft extended his arm, pointed his gun at defendant's face and squeezed the trigger. The gun misfired. Before he could pull the trigger again defendant grabbed the gun and twisted it from Ashcraft's hand. As Ashcraft arose from his position defendant struck him with the butt of the gun on the side of the face, on the top of the head and on the wrist as Ashcraft sought to protect himself. Defendant then brought the truck to a halt.

After the truck was stopped a third person, who was a stranger to Ashcraft, stepped onto the running board on the passenger side. Defendant instructed this person to "Kill [Ashcraft], shoot him, . . . he's recognized me." Defendant lost possession of the gun as he and Ashcraft struggled in the cab. The person on the running board extended his arm into the cab, holding a handgun. Ashcraft managed to kick at the gun and at the face of the man who fell back. Ashcraft then forced the door open and fled from the truck where it was stopped near the middle of the street. Defendant was then still in the driver's compartment, the third person was on the running board on the driver's side, and two other persons were approaching the truck from a driveway. When Ashcraft looked back for the last time such persons appeared to be returning to the driveway. He telephoned the police from an eating establishment a short distance from where he had made his escape.

The truck had been driven a distance of about 15 blocks during the 20-minute period since defendant entered it. Police officers found the truck abandoned where Ashcraft had left it. His wounds required 33 stitches to close.

Ashcraft identified defendant by name at the time police officers arrived in response to his telephone call. Defendant was arrested 10 days later as he sought to conceal himself in a closet when officers came to his fiancee's home with a warrant for his arrest. His defense at trial was a flat denial of any involvement. In a pretrial extrajudicial statement to officers defendant claimed that he had left California for Kentucky three days before the commission of the crime. At trial he conceded that such statement was false.

## Evidence of Prior Wrongful Conduct

We first address ourselves to defendant's claim that evidence of two prior robberies was erroneously and prejudicially received at trial. The first such robbery was the previously mentioned highjacking of Ashcraft and his truck which had occurred some 18 months earlier. At the trial of defendant in that case the victim and another witness made identifications which were only tentative but during the course of those proceedings Ashcraft did have the opportunity to observe defendant on numerous occasions. The victim as well as other witnesses testified at the instant trial to the facts of the prior highjacking.

Although evidence of character is inadmissible when offered to prove specific conduct on a particular occasion, there is no prohibition against "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive . . . , plan, knowledge, identity . . .) other than his disposition to commit such acts." (Evid. Code, § 1101, subd. (b).) In particular issue here is the accuracy and integrity of Ashcraft's identification of defendant. ■ The identification, essential to the People's case, is materially buttressed by evidence that the victim was familiar with and able to recognize defendant because of observations made at a time prior to the kidnaping and robbery. Evidence of the circumstances which made it possible for the victim to identify defendant, although it disclosed a prior highjacking, was thus relevant to establish the credibility of the identification.

But proof of the identification was not the only verification of a material factual matter served by the receipt of evidence of the earlier highjacking of Ashcraft's truck. Defendant's motive or plan in seizing the truck is explained by the circumstances of the earlier highjacking where he brought the truck to the home of a confederate for the purpose of removing the liquor. Such evidence constituted some confirmation that defendant entertained the necessary mens rea for robbery in the instant case. By reason of the victim's escape as hereinabove set forth the liquor was not removed from the truck and the evidence of an intent to steal is thus circumstantial in nature. It was incumbent on the People to attempt to buttress their proof of felonious intent by evidence of a plan or scheme in common with that on the occasion of the prior highjacking. Moreover, evidence of the earlier offense is necessary to explain defendant's threat that he would kill Ashcraft "this time," and his instructions to his unknown accomplice to shoot the victim because he had recognized defendant. Such remarks tend to establish intent to commit bodily harm, an element of the charged offenses.

We have dealt with the applicablity of the rules enunciated in Evidence Code section 1101 which is a codification of the existing law at the time

of its enactment (see comment, Law Revision Com., Evid. Code, § 1101). In *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91], we held: "When . . . a primary issue of fact is whether or not defendant rather than some other person was the perpetrator of a crime charged, evidence of other crimes is ordinarily admissible if it discloses a distinctive *modus operandi* common to the other crimes and the charged crime." (*Id.*, at p. 245.) However, the inference that the accused is guilty of the charged crime because of its common marks with uncharged crimes committed by him, does not arise "from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together. Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." (*Id.*, at pp. 245-246.)

We have no difficulty in concluding that, even ignoring other similarities, the common mark of the identical perpetrator and identical victim in both the charged and uncharged offenses is so distinctive that it adds persuasive support to the inference that defendant and not some other person was the perpetrator of both offenses involving Ashcraft. (See *id.*, at p. 249.) Testimony received at trial clearly invests the evidence of the charged crimes with probative value sufficient to outweigh any undue prejudice, and was properly received pursuant to Evidence Code section 1101.

██ At the outset we note that the evidence relating to the prior highjacking of the victim's liquor truck was not rendered inadmissible by reason of the fact that defendant had been acquitted of the crimes charged in connection therewith. (*People* v. *Griffin* (1967) 66 Cal.2d 459, 464 [58 Cal.Rptr. 107, 426 P.2d 507].) As required by *Griffin* the trial court received evidence of the defendant's acquittal of the prior charges and instructed the jury both at the time of receipt of the evidence and at the conclusion of trial as to the limited use of the testimony.

██ Defendant complains, however, of hearsay testimony received in connection with the evidence of the prior highjacking. A police officer

testified that he was able to connect defendant with the prior highjacking by a name appearing on the registration of a vehicle parked near the point to which the truck had been removed. As the officer's testimony did not purport to assert the true identity or name of the owner appearing on the registration certificate and was merely an account of the officer's observation and conduct, such testimony was not hearsay and the objection was properly overruled.

In addition to the evidence of the prior highjacking of Ashcraft's truck by defendant, the court also received evidence of another highjacking of a liquor truck involving defendant only a week before the robbery and asportation of Ashcraft. We must ascertain whether the evidence was properly received under the *Haston* test. On the occasion of that highjacking a man took possession of a truck under circumstances which were strikingly similar to those in the instant case. The victim was ordered to and did remain on the floor as the truck was driven for 10 minutes and was then unloaded. Thereafter it was driven to another location and abandoned at which time the victim escaped. One Robert Green testified that on that prior occasion the truck was highjacked by him, defendant and a third person; that defendant drove the truck to a house at the very location where the truck in the case now before this court was later to be stopped; that 180 cases of liquor were unloaded from the truck; and that he, Green, then drove the truck away and abandoned it.

Ashcraft testified in the present case that there were three men who appeared to come to defendant's asistance when the truck was stopped, and a police officer who searched the house at the location found cases of liquor therein.

There are a number of similarities between the charged offenses and the prior uncharged offense which did not involve Ashcraft. In both instances the offenses were committed while the driver was making routine deliveries of liquor; the truck was boarded by a person stepping up from the passenger's side after the driver returned to the cab but before he had put the truck in motion; the intruder was armed with a handgun; the victim was ordered to lie face down on the floor; a person then entered the cab and drove the truck away; the truck was brought to a halt at or near the driveway of the identical house; other persons who were waiting at the truck's destination responded to the truck's arrival by coming out to meet it; the offenses were only a week apart in time and cases of liquor were found in the house at the location to which the truck was driven. Although some of the recited marks may be common to many highjackings of liquor trucks, there are too many similar marks to be ignored. ■ A sufficiently dis-

tinctive combination of circumstances is present which warrants a conclusion that the probative value of the evidence of the prior offense outweighs any undue prejudice which might have resulted by its receipt. There was no abuse of discretion by the trial court in the admission of the evidence. (*People* v. *Haston, supra,* 69 Cal.2d 233, 246, 248-249.)

■ Defendant further claims that the testimony of the witness Green was improperly received because of promises made to him by the prosecution. The details of any benefits which Green may have derived were fully exposed to the jurors in an effort to impeach him and the court instructed the jurors that his testimony should be viewed with distrust.[6] We are aware of no policy or rule which requires the exclusion of his testimony under these circumstances and the attacks thereon were properly directed to the weight of the testimony.

### Sufficiency of Evidence of Robbery

■ Defendant contends that the evidence of robbery is insufficient in that it fails to establish that he took and carried away any personal property in the possession of the victim since nothing was missing from the truck.[7] The claim is patently frivolous. The evidence clearly supports the necessary finding that defendant when he forced Ashcraft at gunpoint to the floor of the cab and drove off evidenced an intent to and did in fact deprive the victim of possession of the truck and the personal property therein. Not only did defendant have dominion and control over the truck and its contents but also over the victim, and the robbery did not remain incomplete merely because defendant abducted both the truck and the victim. The significant evidence that by such modus operandi defendant planned to commit robberies of merchandise in trucks transporting liquor further supports the finding of a completed robbery. When as here the evidence reasonably justifies the findings of the trier of fact reversal is not warranted merely because the circumstances may be reasonably reconciled otherwise. (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

### Sufficiency of Evidence of Kidnaping for the Purpose of Robbery

Relying on *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], defendant argues that the abduction

---

[6]Green entered a plea of guilty to a lesser crime than those initially charged against him.

[7]"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

of Ashcraft does not support a conviction for a violation of section 209 as it was merely incidental to the robbery and did not "substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Id.,* at p. 1139.) Without addressing ourselves to the issue whether the kidnaping was merely incidental to the robbery within the meaning of *Daniels* it conclusively appears from the evidence that the abduction imposed a substantial increase in the risk of harm to which the victim was initially exposed.

In *People* v. *Timmons* (1971) 4 Cal.3d 411 [93 Cal.Rptr. 736, 482 P.2d 648], we stated that the *Daniels* risk-of-harm test referred "to an increase in the risk that the victim may suffer significant physical injuries over and above those to which the victim of the underlying crime is normally exposed." (*Id.,* at p. 414.) ■ There was present here by reason of the abduction a material increase in the risk that the victim would suffer significant physical injuries, as in fact he did. He was forced at gunpoint to lie on the floor of the cab of his truck as it was driven through city traffic. When he looked up he was informed that he would be killed. When he attempted to take positive action in an effort to save his life, he was beaten back with the butt of a gun. When the truck arrived at its apparent destination his abductor urged an armed accomplice to kill the victim while the latter was engaged in a life and death struggle. Only by taking desperate defensive action was the victim able to escape with his life. Obviously, the risk of harm to which he was exposed as the result of the abduction was substantially increased over and above that to which the victim of a robbery is normally exposed and the jury impliedly so found on proper instructions.

### Propriety of Multiple Punishment

Defendant next asserts that sentencing him on both the robbery and kidnaping convictions constitutes multiple punishment in violation of section 654. That section prohibits the imposition of punishment for more than one violation arising out of an "act or omission" which is made punishable in different ways by different statutory provisions.[8]

Because of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an "act or omission," there can be no universal construction which directs the proper application of section 654 in every instance. (See *In re Hayes* (1969) 70

---

[8]Section 654 provides in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punishable under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

Cal.2d 604, 605-606 [75 Cal.Rptr. 790, 451 P.2d 430].) The difficulty would not arise if the reach of section 654 were confined to its literal language, that is, where multiple convictions are based on what is truly a single act or omission. Thus, one who uses a deadly weapon in the commission of first degree robbery simultaneously assaults the victim with such weapon but clearly may not be punished for both the robbery and assault with a deadly weapon. (*People* v. *Logan* (1953) 41 Cal.2d 279, 290 [260 P.2d 20]; see also cases collected at pp. 375-376, *People* v. *Bauer* (1969) 1 Cal.3d 368 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398].) The applicability of section 654 is perhaps most obviously suggested where there has been a conviction of both a charged crime and a lesser included offense. But this does not set the limits of its applicability in the case of a single act or omission: "If a course of criminal conduct causes the commission of more than one offense, each of which can be committed without committing any other, the applicability of section 654 will depend upon whether a separate and distinct act can be established as the basis of each conviction, or whether a single act has been so committed that more than one statute has been violated. If only a single act is charged as the basis of the multiple convictions, only one conviction can be affirmed, notwithstanding that the offenses are not necessarily included offenses. It is the singleness of the act and not of the offense that is determinative." (*People* v. *Knowles* (1950) 35 Cal.2d 175, 187 [217 P.2d 1].)[9]

The "singleness of the act," however, is no longer the sole test of the applicability of section 654. " 'Section 654 has been applied not only where there was but one "act" in the ordinary sense . . . but also where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654.' [*People* v. *Brown* (1958) 49 Cal.2d 577, 591 (320 P.2d 5).] [¶] Whether a *course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective of the actor*. If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]; italics added.) In *Neal* the "course of criminal conduct" resulted in the attempted murder of two victims when gasoline was thrown into

---

[9]*Knowles,* as did other earlier cases, construed section 654 as requiring that all except one of the multiple convictions be set aside. However, section 654 as applied in this context is a prohibition against multiple punishments rather than convictions and the distinction was recognized by this court in *People* v. *McFarland* (1962) 58 Cal.2d 748, 762-763 [26 Cal.Rptr. 473, 376 P.2d 449]: "The appropriate procedure . . . is to eliminate the effect of the judgment as to the lesser offense insofar as the penalty alone is concerned."

their bedroom and ignited by the defendant. Since he entertained only an objective to kill, and the arson was merely incidental to that objective, his course of conduct was not deemed to be divisible and he could not be punished for arson as well as the attempted murders.[10]

The *Brown-Neal* test thus appears to enlarge the literal language of section 654 by including as an "act or omission" a course of criminal conduct wherein multiple violations are incident to an accused's single criminal objective. On the other hand, when an accused has embarked upon a course of conduct wherein he may be deemed to have entertained multiple criminal objectives none of which are merely incidental to any other, the meaning of "act or omission" has been construed in a manner consistent with that multiple objective and what may appear on the surface to be a single act may embody separately punishable violations. We must, accordingly, give heed to an accused's objectives when they can be ascertained. (See *In re Hayes, supra,* 70 Cal.2d 604.) In *Hayes* the accused, while driving alone in his automobile, committed violations of both driving while under the influence of intoxicating liquor (Veh. Code, § 23102) and driving with knowledge of a suspended license (Veh. Code, § 14601). A majority of this court held that the act or omission of which section 654 speaks is the *criminal* act or omission which is a part of the accused's conduct—"the proper approach . . . is to isolate the various *criminal* acts involved, and then to examine only those acts for identity." (*Id.,* at p. 607.) The majority's approach in *Hayes* produced two simultaneous criminal acts —driving while intoxicated and driving with a suspended license—which

---

[10]The *Brown-Neal* test has generated a number of refinements in the area where the test is applicable. Thus in *Neal* there were two victims and we affirmed as to the attempted murder conviction of each victim holding that the Legislature could not have intended that section 654 be applicable where the course of conduct results in acts of violence which constitute separate violations as to separate individuals. The net effect of our holding in that case was that where multiple acts of violence occur against multiple victims, the course of conduct is divisible. (See also *In re Wright* (1967) 65 Cal.2d 650, 656 [65 Cal.Rptr. 650, 56 Cal.Rptr. 110]; *People* v. *Knowles, supra,* 35 Cal.2d 175, 187; *People* v. *Brannon* (1924) 70 Cal.App. 225, 235-236 [233 P. 88].) On the other hand, where a course of conduct involves only crimes against property interests of multiple victims, common sense requires, in the absence of other circumstances, a determination of the indivisibility of the course of conduct and the applicability of section 654. (See *People* v. *Bauer, supra,* 1 Cal.3d 368, 377-378.)

Decisions have also established that a course of conduct which is indivisible as to the intent and objective of the actor, is not made divisible merely because: (1) multiple items of property which he wrongfully seized, thus constituting one violation, may have included one or more items of property which he could not lawfully possess (contraband) thus constituting other violations (see *People* v. *Quinn* (1964) 61 Cal.2d 551, 555-556 [39 Cal.Rptr. 393, 393 P.2d 705]); and (2) one of the crimes is completed before the other is commenced (see *People* v. *McFarland, supra,* 58 Cal.2d 748, 760-762).

shared the common element of the physical act of driving. *Neal* was distinguished on the ground that neither of the *Hayes* violations, although simultaneously committed, was a means toward the objective of the commission of the other. The objectives, insofar as the criminal conduct was concerned, were deemed by the majority to be to drive while intoxicated and to drive with a suspended license.

 This court has thus construed section 654 to be applicable to limit punishment for multiple convictions arising out of either an act or omission or a course of conduct deemed to be indivisible in time,[11] in those instances wherein the accused entertained a principal objective to which other objectives, if any, were merely incidental. The initial inquiry in any section 654 application is to ascertain the defendant's objective and intent. If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.

We have little difficulty in applying the foregoing rules in the instant case. Defendant was convicted of kidnaping for the purpose of robbery and for the commission of that very robbery. We are compelled to the conclusion as a matter of law that on the record here both crimes were committed pursuant to a single intent and objective, i.e., to rob Ashcraft of the truck or its contents. (Accord, *In re Pratt* (1967) 66 Cal.2d 154, 157 [56 Cal.Rptr. 895, 424 P.2d 335]; *In re Ponce* (1966) 65 Cal.2d 341, 343 [54 Cal.Rptr 752, 420 P.2d 224]; *In re Ward* (1966) 64 Cal.2d 672, 676 [51 Cal.Rptr. 272, 414 P.2d 400]; *People* v. *Knowles, supra,* 35 Cal.2d 175, 186-189; *People* v. *Gomez* (1967) 252 Cal.App.2d 844, 860 [60 Cal.Rptr. 881]; *People* v. *Burks* (1962) 204 Cal.App.2d 494, 503 [22 Cal. Rptr. 414]; *People* v. *Velarde* (1962) 201 Cal.App.2d 231, 234 [19 Cal. Rptr. 832].)[12] Pursuant to section 654, defendant may therefore be punished

---

[11]It seems clear that a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. (See *People* v. *Quinn, supra,* 61 Cal.2d 551, 556; *People* v. *Howell* (1966) 245 Cal.App.2d 787, 792 [54 Cal.Rptr. 92]; see also *In re Hayes, supra,* 70 Cal.2d 604, 609.)

[12]The evidence that after the truck was brought to a halt defendant and a third person acting on defendant's orders tried to kill Ashcraft because the latter had recognized defendant might also have supported such additional charges as attempted murder or assault with intent to commit murder. If defendant had been convicted of either of such charges, he could arguably have been separately punished therefor on the theory that the belated attack on Ashcraft was not part of defendant's original objective but was subsequently conceived in response to an unexpected event occurring during commission of the underlying crime. (See *People* v. *Massie* (1967) 66 Cal.2d 899, 908 [59 Cal.Rptr. 733, 428 P.2d 869]; *In re Chapman* (1954) 43 Cal.2d

for only one of such crimes. As punishment for second degree robbery is the lesser punishment for the two crimes, its execution must be stayed. (See *In re Wright, supra,* 65 Cal.2d 650, 656; *People* v. *McFarland, supra,* 58 Cal.2d 748, 763.)

The judgment is modified (1) by fixing the degree of the robbery as in the second degree; (2) by striking therefrom the finding "that the victim was subjected by defendant to bodily harm as charged in Count 2"; (3) by striking the finding that "the Court fixed the penalty at life imprisonment without possibility of parole" and substituting therefore a finding that "the Court fixed the penalty at life imprisonment"; (4) by striking that portion of the judgment in its entirety wherein the trial court purports to make its order and substituting in its place the following (see *In re Wright, supra,* 65 Cal.2d 650, 655-656, fn. 4; *People* v. *Niles* (1964) 227 Cal.App.2d 749 [39 Cal.Rptr. 11]): "It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the State Prison for the term of his natural life as to Count 2 and that he be sentenced for the term provided by law as to Count 1 provided, however, that execution of sentence for Count 1 be stayed pending the finality of this judgment and service of sentence as to Count 2, such stay is to become permanent when service of sentence as to Count 2 is completed."

As so modified the judgment is affirmed.

McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

385, 389 [273 P.2d 817]; *People* v. *O'Farrell* (1958) 161 Cal.App.2d 13, 22 [325 P.2d 1002]; *cf. Seiterle* v. *Superior Court* (1962) 57 Cal.2d 397, 401-402 [20 Cal. Rptr. 1, 369 P.2d 697].)