Filed 5/9/13  P. v. Watson CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTHONY JASTON WATSON,<br><br>    Defendant and Appellant. | H037764<br>(Santa Clara County<br>Super. Ct. No. C1079774) |

Defendant Anthony Jaston Watson was sentenced to 10 years in prison after the trial court, sitting without a jury, found him guilty of offenses including assault with a semiautomatic weapon, issuing criminal threats, and exhibiting a firearm.  On appeal he contends that the court erred by imposing concurrent sentences on the latter two charges because they rested on the same course of conduct as the first, such that execution of sentence with respect to them should have been stayed under Penal Code section 654.  Respondent counters that there was substantial evidence from which the trial court could have found that the three offenses had distinct criminal objectives, rendering them severable, and thus separately punishable.  We have concluded that while the conviction for exhibiting a firearm may be separately punished, the conviction for issuing criminal threats may not.  Accordingly we will modify the judgment to stay the term on the latter charge.  We will affirm the judgment as so modified.

## BACKGROUND

At the time of the events in question, defendant was intimately involved with Alison Croft, who had previously been involved, and had borne a daughter, with the victim, Genaro Fuentes. On the afternoon of June 12, 2010, Croft and Fuentes argued over who would care for the child that evening, with Fuentes attempting to drop her off at Croft's house and Croft stating that she had plans to go out. Fuentes drove her back to his home. A few minutes later, around 3:30 p.m., he received a text message from defendant's mobile phone number, to the effect that Fuentes would never get Croft back.[1] Fuentes replied with a message to the effect that every time defendant kissed her, he should remember that she had given oral sex to Fuentes.[2] Defendant replied that he had enjoyed those favors as well, adding, "you keep talking, you know I will fuck your shit up. Your mom too, bitch."

That evening, around 6:00 or 7:00 p.m., Croft visited Fuentes at his mother's home, where he resided, in order to spend some time with her daughter. During the visit

---

[1] The message, as retrieved from defendant's cell phone, was read into the record as follows: " 'What's the problem bitch. You will never get her back . . . . You piece of shit. Fuck you and Nita. Be happy you ain't dead yet, you fucking scrap. I said yet, bitch.' "

[2] The message actually said that Fuentes had ejaculated in her face. An officer read it while testifying, and both parties quote it in their briefs. The cited testimony, however, was stricken on the ground that it was not responsive to the question asked. A few questions earlier the prosecutor had sought to elicit the text of the message, but withdrew the question when defense counsel lodged a hearsay objection. The objection was manifestly unsound; the statement was not offered for the truth of its contents (that defendant could "[k]eep the bitch," that Fuentes "[didn't] want her," and that he had "cummed all over her face"), but as evidence of the escalating antagonism that culminated in the violent encounter from which the present charges arose. (See Evid. Code, § 1200.) The statement was also necessary to provide context for defendant's reply, which was in evidence, and which commenced with the phrase "Me too." Nonetheless, the testimony having been stricken, the text of the message was not in evidence.

2

she accused Fuentes of taking her cell phone, which he denied having done, although he admitted on the stand that he had taken her phone on a previous occasion. Some time later, around 10:00 p.m., Fuentes saw a black pickup drive past the house three times. On the third time, it stopped on the far side of a stand of trees. Standing in the doorway of the house, Fuentes heard the truck's door open and close, and then saw defendant approaching through the trees with a bottle in his hand. He flung the bottle to the ground, shattering it. He demanded, "[W]here is her cell phone." He then stopped and pulled a small black handgun from his waistband, of the type that can "crack[] back," i.e., a semiautomatic. He pulled the slide back, ejecting a cartridge. He came toward Fuentes, who was still standing in the doorway, pointing the gun at him and saying " 'Mother fucker, where is the telephone? Where is her phone at.' " Asked what he replied, Fuentes testified, "I was like, 'What are you talking about.' "[3] When defendant reached him, "[H]e put the gun in front of me and just kept shoving me and telling me, 'Where's the phone at,' and kept cussing at me. And I begged him to let my girls get out of the way because my daughter was right next to me. And he said, he's all, 'Fuck your daughters.' "

At this point Fuentes had taken a step backward, into the house. His youngest daughter, age 5, was right next to him; her two older sisters were about 10 feet away. While looking at them, Fuentes felt a blow from "something cold and hard." He fell back onto a sofa, and then to the floor, bleeding from his chin.[4] His youngest daughter jumped

---

[3] On cross-examination Fuentes testified that defendant "asked me only once about the cell phone. And then when I said what cell phone, he raised it [i.e., the gun] and with his left-hand side, he slide it back and then that's when I seen the shiny thing fly out on. And then he started walking towards me pointing the gun at me."

[4] He still had a scar from the blow, though at the time of trial it was concealed by a goatee. Also, when he awoke the morning after the assault, he observed bruises on his arms and stomach. He did not recall how he sustained these, but two of his daughters

on top of him. While he lay on his side, with his daughter on top of him, defendant came into the house and stood over him, pointing the gun at him. Fuentes testified, "I was still telling him, you know, begging him, to let my daughters go and he can do whatever he wants after that. And he's like, 'I'm going to kill you, mother fucker. I don't care,' you know." Fuentes was afraid for his daughters. Defendant again "cranked the gun" such that a "bullet flew out." He "kept pointing the gun at me and saying, 'I'm going to kill you.' " Fuentes estimated that defendant had stood over him for "a good 40, 50 seconds," during which time Fuentes had his daughter in his arms. Defendant "finally just turned around and left." He walked straight to the street, where Fuentes "hear[d] the truck leave." A neighbor testified that she heard screeching tires and looked out the window to see a black truck being driven "out of our street very fast."

Defendant was ultimately charged with (1) assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)), (2) criminal threats (*id*., § 422), (3) child endangerment (*id*., § 273a, subd. (a)), (4) first degree burglary (*id*., §§ 459-460, subd. (a)), (5) exhibiting a firearm (*id*., § 417, subd. (a)(2)), and (6) threatening or obscene communication via electronic communication device (*id*., § 653m, subd. (a)).

The matter was tried to the court, which found defendant guilty on all charges except child endangerment (count 3). The court imposed a sentence of 10 years, consisting of six years on the assault (count 1), plus four years for use of a firearm (Pen. Code, § 12022.5, subd. (a)). The court imposed an additional, concurrent term of two years for criminal threats (count 2). On the burglary charge (count 3) the court imposed the midterm of four years, but ordered it stayed pursuant to Penal Code section 654 (§ 654). On each of counts 5 and 6—exhibiting a firearm and electronically

---

testified that defendant had kicked him, one specifying that she saw him "kick him in the stomach" while he was on the ground.

communicating obscene or threatening language—the court imposed an additional 60 days, to be served concurrently.

Defendant filed this timely appeal.

DISCUSSION

Defendant's sole claim of error is that the court should have stayed the sentences on counts 2 and 5, i.e., criminal threats and exhibiting a firearm. He relies on section 654, subdivision (a), which states that where an act or omission is punishable under more than one provision of law, the defendant "shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." This prohibition applies not only to singular acts or omissions but to "a course of conduct which violates more than one statute but constitutes an indivisible transaction." (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438 (*Saffle*); see *People v. Harrison* (1989) 48 Cal.3d 321, 335, quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639 [statute "has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time' "].) Where a defendant is convicted of multiple offenses based on such a course of conduct, the correct disposition is to impose sentence on all of them, but stay execution as to all but the charge carrying the greatest punishment. (*People v. Snow* (2003) 105 Cal.App.4th 271, 283.) For purposes of these rules, concurrent sentences constitute multiple punishment. (*In re Wright* (1967) 65 Cal.2d 650, 655; *People v. Deloza* (1998) 18 Cal.4th 585, 592.) A sentence imposing multiple punishment in violation of these principles is an act in excess of jurisdiction, which may be challenged on appeal despite a failure to object in the trial court. (3 Witkin, Cal. Criminal Law (4th ed. 2012) Punishment, § 248, p. 398.)

"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the

5

actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. California* (1960) 55 Cal.2d 11, 19 (*Neal*), disapproved on another point in *People v. Correa* (2012) 54 Cal.4th 331, 344; see *Saffle*, *supra*, 4 Cal.App.4th at p. 438.) To sustain multiple punishments, "[T]here must be evidence to support a finding that the defendant formed a separate intent and objective for each offense for which he was sentenced." (*People v. Green* (1996) 50 Cal.App.4th 1076, 1085.) This of course presents a question of fact, the trial court's determination of which will be reviewed under the deferential substantial evidence standard. That is, the court's finding—express or implied—will be sustained if there is substantial evidence to support it, whether or not the evidence would also support a contrary finding. (*Neal*, *supra*, 55 Cal.2d at p. 17.) This rule comes into play, however, only when the trial court's determination can be said to rest on "conflicting evidence." (*Ibid.*) "[T]he applicability of the statute to conceded facts is a question of law" (*People v. Harrison* (1989) 48 Cal.3d 321, 335), which of course a reviewing court will consider without deference to the trial court's ruling.

Here it seems plain that all of defendant's felony offenses—assault, burglary, and criminal threats—were committed in pursuit of a single objective, i.e., terrorizing the victim in response to several perceived outrages he had committed against defendant and defendant's girlfriend. The prosecutor suggested that one of the offenses—the criminal threat to kill—was intended "to convince Mr. Fuentes to give the cell phone back or to Mr. Watson." But according to Fuentes defendant only mentioned the cell phone once, when he first approached the house; when Fuentes professed innocence, defendant proceeded to menace and strike him with the gun, follow him into the house (thereby committing burglary), and stand over him while kicking him and threatening unconditionally to kill him. He then fled the scene, leaving Fuentes bleeding on the floor.

If defendant's objective was to retrieve the cell phone, this seems a singularly ineffectual way to go about it. There was no evidence of a *conditional* threat, as one might issue if one's object were to coerce the victim into complying with some demand. The trial court might reasonably find that defendant's *initial display of the gun* was motivated by some such objective; at any rate he produced the gun, according to Fuentes, at the same time he demanded to know the whereabouts of the supposedly purloined phone. For this reason we cannot say that the charge of exhibiting a firearm could not be severed from the remaining charges for purposes of section 654's prohibition against multiple punishment. But the threats to kill—the basis for the conviction of criminal threatening—occurred in concert with the ensuing assault and burglary, after defendant had apparently abandoned any thought of actually obtaining the phone, but had instead fallen into a vengeful rage. From that point on he made no attempt to recover the phone. Indeed he gave Fuentes no opportunity to retrieve it. He simply began beating him while uttering unconditional threats to kill him.

Moreover, if retrieval of the phone could be found to have been defendant's objective in issuing criminal threats, it would seem equally to have been an objective of the assault and burglary. If any of them were intended to force Fuentes to produce the phone, they all were. We detect no basis in this record to find that one or more of these felonies were committed for one purpose, and one or more others for a different purpose. All of this more-or-less simultaneous conduct—the assault with the handgun, the entry into the home, and the oral threat to kill—constituted a single indivisible course of conduct all accompanied by the same objective or set of objectives, i.e., to humiliate, intimidate, and punish the victim. We must therefore conclude that defendant is correct with respect to the criminal threats charge, and that the sentence on it should have been stayed, as was the sentence on the burglary charge.

7

As we have suggested, the situation is different with respect to the charge of exhibiting a firearm (count 5).  According to Fuentes, defendant first displayed the gun as he approached the house, while simultaneously demanding to know the whereabouts of the missing cell phone.  The court could reasonably find that this conduct was indeed motivated by a desire to coerce Fuentes into producing the phone.  When it failed of that purpose, defendant evidently formed the intent to beat and terrorize Fuentes in punishment and revenge for his supposed theft of the phone and his other perceived outrages.  This rationale is sufficient to make the exhibition of the gun severable from the ensuing conduct.

## DISPOSITION

The judgment is modified to state that the sentence on count 2 is stayed pursuant to section 654.  The trial court is directed to modify the abstract of judgment accordingly.  In all other respects the judgment is affirmed.

_____
RUSHING, P.J.

WE CONCUR:


_____
PREMO, J.



_____
ELIA J.


8