Filed 6/2/14  P. v. Lomeli CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B248573 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA080299) |
| v. | |
| MARCOS DAVILA LOMELI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. David Sotelo, Judge.  Affirmed.

Edward Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Marcos Davila Lomeli appeals from a judgment which sentences him to state prison for a crime spree that began with the murders of James and Gabriela (Gabby) Stein.[1]  Lomeli contends the trial court erred in imposing a consecutive sentence on count 18, for dissuading a witness, as it should have been stayed under Penal Code[2] section 654.  Lomeli further contends the trial court erred when it imposed a $10,000 parole revocation fine under section 1202.45.  We affirm the judgment.

## FACTS

Lomeli and his girlfriend, Jenny Salazar, lived with Gabby and James in a property owned by James's mother, Gladys.  On December 8, 2010, Gabby's daughter heard Lomeli threaten to kill James "like a dog" while she was visiting.  When James visited his mother the following day, she noticed he looked like he had been in a fight.  That was the last time Gladys saw James.  On December 16, 2010, Gladys asked her two other sons to check on James.  They were unable to find him at the property.  Gladys reported James missing on December 17, 2010.  The police conducted three welfare checks at the property to investigate James's disappearance, but were unable to determine James's whereabouts.  They observed Gabby on two of these visits and last saw her on December 28, 2010.

In January 2011, Lomeli approached Richard Hugh, an acquaintance of Salazar's, for financial assistance.  He told Hugh he had inherited a sum of money and wanted help investing it.  Hugh set up a time to meet with him, but Lomeli did not show up.  Later that night, Salazar went to Hugh's home and told him Lomeli was outside, down the block.  After they got into Hugh's truck and had driven a short distance, Salazar demanded Hugh's iPhone.  She slashed him across the throat with a knife and stabbed him in the buttocks during the ensuing struggle.  When Salazar got out of the truck, Hugh followed her.  Lomeli then approached the vehicle.  Hugh told Lomeli what had

---

[1]  For ease of reference, we will refer to members of the Stein family by their first names.

[2]  All further section references are to the Penal Code unless otherwise specified.

2

happened.  Lomeli denied Salazar did anything to Hugh, and suggested Hugh cut himself.  Salazar refused to return the phone and ran away.  When Hugh tried to get back into his truck, Lomeli entered on the passenger side, took his keys, and said, "I can't let you go anywhere."  Lomeli then left in his own truck.  Hugh called the police after walking back to his house.

On or about February 11, 2011, Lomeli asked his elementary school friend, Jesus Jaime, to help him bring some bicycles and other items to Culver City in Jaime's truck.  After they loaded the truck, Lomeli and Salazar tied Jaime up at gunpoint and put a bag over his head.  Lomeli told Jaime, "You don't want to see this.  I don't want to get you involved.  I have to dig six feet under concrete."  Lomeli told Jaime he needed to move bodies with Jaime's truck.  When Jaime attempted to flee, Lomeli tied him up again and asked a 16-year-old neighbor to watch Jaime and shoot him if he attempted to escape.  Jaime was eventually able to flee and flag down a police officer.

On the night of February 13, 2011, Rodolfo Pedraza stepped out of his truck to take a phone call.  He left the engine running.  Pedraza was approached by Lomeli, who threatened him.  Lomeli then stole Pedraza's truck, drove a short distance to a bus stop and let Salazar into the truck.

Salazar was arrested on February 14, 2011.  The next day, Lomeli arrived at the apartment of Salazar's cousin, Nicole Aguilar, to ask her to bail Salazar out of jail.  When she refused and attempted to call the police, Lomeli threatened her and threw her phone away.  He then choked her until she passed out.  He hogtied her with zip ties and put duct tape over her eyes, mouth and ears.  He also pulled down her pants, telling her none of this would have happened if Aguilar had agreed to bail Salazar out of jail.  After she regained consciousness, Lomeli told her he planned to have her shoot "Jesse" for "ratting on him" about the murders of James and Gabby.  Lomeli then carried Aguilar out to her car, put her in the back seat, and drove away.  After driving around for a few hours and making several stops, Lomeli took Aguilar to a motel, where he untied her.  She remained seated on the bed while Lomeli retrieved items from the car.  At one point, he told Aguilar to walk to the gas station to get a "blunt wrapper" for him.  She walked there

3

alone, but Lomeli arrived as Aguilar was about to pay at the cash register and they walked back together.

Lomeli admitted to Aguilar that he killed James and Gabby, but denied Salazar had anything to do with the murders. He said he "chopped them up" and buried them in the backyard. After making his admissions, Lomeli ordered Aguilar to go into the bathroom. Approximately 20 minutes later, Lomeli came into the bathroom and said, "I'm sorry. I am going to have to do this. Um, I didn't want to have to do it, but I have to do this to you now. I'm sorry." He tied Aguilar up again and told her that he was receiving messages on Aguilar's cell phone which led him to believe that her friends and family knew he had kidnapped her.

Desperate to calm him down and prevent him from harming her, Aguilar promised Lomeli she would tell the police that two men broke into her apartment and kidnapped her, but then let her go. She convinced him he would be able to flee to Mexico by disguising himself with her mother's clothes. Lomeli ultimately let her leave with some of her belongings. Aguilar was frightened when the police interviewed her at her apartment. She initially told them the story she and Lomeli had invented for fear he would harm her and her family as he had threatened to do. Aguilar eventually told the police that it was Lomeli who had kidnapped her.

James' body was discovered buried in the backyard of the property on February 15, 2011. The cause of death was determined to be ligature strangulation. Lomeli was arrested on February 16, 2011, in a motel room with Aguilar's personal items, including her bank card. The police found zip ties in the motel room and in the parking lot. Gabby's body was found buried in the backyard on February 19, 2011. She had also been strangled to death.

Lomeli and Salazar[3] were charged with 22 criminal counts in total for their crime spree. A jury found Lomeli guilty of the following:

---

[3]    Salazar was tried separately and is not a party to this appeal.

Counts 4 through 7 related to crimes against Jaime, including count 4 for carjacking (§ 215, subd. (a)), count 5 for first degree residential robbery (§ 211), count 6 for false imprisonment by violence (§ 236), and count 7 for assault with a firearm (§ 245, subd. (a)(2)). Firearm enhancements further alleged with respect to counts 4 through 6 were found true. (§ 12022.53, subds. (a)(c).) Count 8 for carjacking Pedraza's vehicle (§ 215, subd. (a)). Count 11 for second degree murder of James and count 12 for first degree murder of Gabby (§ 187, subd. (a)), with a true finding as to a multiple murder special circumstance allegation (§ 190.2, subd. (a)(3)), as to both counts. Counts 16 through 19 and 21 related to crimes against Aguilar, including count 16 for first degree residential robbery (§ 211), count 17 for battery with serious bodily injury (§ 243, subd. (d)), count 18 for kidnapping (§ 207, subd. (a)), count 19 for false imprisonment (§ 236), and count 21 for dissuading a witness by force or threat (§ 136.1, subd. (c)(1)) with the further allegation that Lomeli acted maliciously and used or threatened to use force found to be true.

Lomeli was sentenced to life without the possibility of parole on count 12 and a consecutive sentence of 15 years to life on count 11 for the murders of Gabby and James. He was also sentenced to an aggregate determinate term of 33 years four months for count 4 (nine years plus 20 years for the firearm enhancement), count 8 (one year eight months), count 18 (one year eight months) and count 21 (one year). The trial court ordered the indeterminate terms to be served consecutively with the determinate terms. The sentences on counts 5, 6, 7, 16, 17, and 19 were stayed pursuant to section 654. Lomeli timely appealed.

## DISCUSSION

Lomeli challenges two of the trial court's sentencing orders. First, he contends the consecutive term imposed on count 21 for dissuading a witness by force or threat must be stayed pursuant to section 654. Second, he contends the parole revocation fine imposed pursuant to section 1202.45 should be stricken because his sentence includes an indeterminate life sentence without the possibility of parole. Neither argument warrants a change in the judgment.

5

## I.       Section 654

According to Lomeli, he harbored the same intent and objective—to facilitate his own escape from the detection of authorities—when he committed the crimes of kidnapping (count 18) and dissuading a witness (count 21).  Therefore, his intent in dissuading Aguilar from speaking to the authorities was merely incidental to his objectives in kidnapping her and his sentence for count 21 should be stayed under section 654.  We disagree.  The record supports a finding that Lomeli held a different objective in kidnapping Aguilar from the one he held in dissuading her to cooperate with the authorities.

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."  The Supreme Court has enlarged the scope of section 654 to include a course of conduct with a single criminal objective within the definition of "an act or omission."  (*People v. Beamon* (1973) 8 Cal.3d 625, 638.)  Whether a course of criminal conduct constitutes an indivisible transaction under section 654 depends on the intent and objective of the actor.  (*Beamon, supra*, at p. 637.)  The determination of whether there was more than one objective is a factual determination, which must be supported by substantial evidence.  (*People v. Macias* (1982) 137 Cal.App.3d 465, 470; *People v. Murphy* (1980) 111 Cal.App.3d 207, 213.)

Lomeli relies on *People v. Latimer* (1993) 5 Cal.4th 1203, to support his contention.  *Latimer* is distinguishable.  There, the defendant kidnapped the victim, drove her to the desert, and repeatedly raped her.  The Supreme Court held section 654 prohibited punishment for the kidnapping and the multiple rapes because "the evidence does not suggest any intent or objective behind the kidnapping other than to facilitate the rapes."  (*Latimer, supra*, at p. 1216.)

6

Here, the evidence is to the contrary. There is no indication Lomeli's intent in dissuading Aguilar was merely incidental to his objectives in kidnapping her. Despite Lomeli's protestations on appeal, there is no evidence to show Lomeli kidnapped Aguilar and dissuaded her from cooperating with the authorities in an attempt to facilitate his escape. Substantial evidence instead demonstrates that he kidnapped Aguilar because he was angry she would not cooperate and as a way to force her to bail out Salazar. He also indicated he wanted her to shoot someone named "Jesse." Those were the only two objectives he conveyed to Aguilar. He was enraged when Aguilar refused to help him. After he hogtied her in the apartment and pulled her pants down, he told her that his actions would have been unnecessary had she agreed to help him bail out Salazar.

There was no discussion of escape when he arrived at Aguilar's apartment, when he drove around for hours, or when they arrived in the motel. He had eluded the authorities to this point and showed no signs he was concerned they would apprehend him any time soon. He left Aguilar alone in the bathroom with her laptop, allowed her to remain untied in the motel room while he retrieved her personal items from her car, and allowed her to walk to the gas station alone. These facts show he was not concerned she would report him to the police. Indeed, there is no evidence in the record that he discussed escaping until he began receiving text messages on Aguilar's mobile phone indicating her friends and family knew she had been kidnapped. At that point, he said, for the first time, that he needed to escape to Mexico. Aguilar then convinced him he could disguise himself to avoid the authorities. They agreed on the story Aguilar would tell the authorities about who kidnapped her, after he threatened to harm her family if she implicated him in the crime. Substantial evidence supports a finding that Lomeli held two different objectives in committing the crimes of kidnapping and dissuading a witness. He initially intended to forcibly obtain Aguilar's cooperation in bailing Salazar out of jail and then his objective turned to evading the authorities when he realized Aguilar's friends and family knew she had been taken. Section 654 does not apply to stay the sentence on count 21.

## II.    Parole Revocation Fine

At sentencing, the trial court imposed and suspended a $10,000 parole revocation fine pursuant to section 1202.45.  Because he is serving an indeterminate term of life in prison without the possibility of parole, Lomeli contends the fine was unauthorized and must be stricken.  Section 1202.45, subdivision (a) provides:  "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."  As explained by the Supreme Court in *People v. Brasure* (2008) 42 Cal.4th 1037, 1074, the fine is required in every case where a defendant is sentenced to a determinate prison term, regardless of whether he is also sentenced to an indeterminate term or to death.  The fine was properly imposed and suspended.

### DISPOSITION

The judgment is affirmed.


BIGELOW, P.J.

We concur:



FLIER, J.



GRIMES, J.


8