Filed 6/24/15  P. v. Corpening CA4/1
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064986 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS258343) |
| TORY J. CORPENING, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frances M. Devaney, Judge.  Affirmed in part and reversed in part.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor, Robin Urbanski, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Tory J. Corpening entered guilty pleas to carjacking (count 1; Pen. Code,[1] § 215, subd. (a)); robbery (count 2; § 211); assault with a deadly weapon (count 3; § 245, subd. (a)(1)); receiving stolen property (count 4; § 496, subd. (a)); and witness intimidation (count 7; § 136.1, subd. (a)(1)).

Corpening filed a motion to withdraw his guilty plea, which was denied after an evidentiary hearing. He was thereafter sentenced to a determinate term of six years eight months in prison.

Corpening filed a timely notice of appeal.

In his appeal, Corpening contended the trial court erred in imposing a one-year consecutive term for the robbery in count 2. He contended section 654 bars such sentence because the carjacking and the robbery were committed by a single act with a single purpose. He also contended the court erred in imposing a stayed sentence for receiving stolen property in count 4 because a person cannot be convicted of robbery and receiving the stolen property taken from the robbery. The People correctly agreed with the latter contention. In an unpublished opinion filed October 21, 2014, we dismissed the receiving stolen property conviction and otherwise affirmed the judgment as modified.

On February 11, 2015, the Supreme Court granted review and transferred the case to us with directions to reconsider our opinion in light of *People v. Jones* (2012) 54 Cal.4th 350 (*Jones*).

We have received additional briefing and have reconsidered our opinion in light of *Jones, supra,* 54 Cal.4th 350. After again reviewing the record, we are satisfied the

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

crimes in this case occurred during a course of conduct with separate purposes and did not involve a single physical act. Therefore, we will again affirm the judgment as modified with directions to dismiss the receiving stolen property conviction.

STATEMENT OF FACTS

This appeal arises from guilty pleas. As such, the only statement of the facts before the trial court is contained in the report of the probation officer. Since the parties have emphasized differing parts of the facts in their briefs, we think the most accurate basis for our review is the probation officer's summary. We therefore set forth that summary verbatim:

"As to Counts 1-4

"On July 22, 2012 at approximately 5:50 a.m., Walter Schmidt Sr., the victim, and his son Walter Schmidt Jr. were at their residence loading their van, which was parked in the front driveway, with coins and other items they were going to sell at a local swap meet. Schmidt Sr. is a currency dealer who specializes in the buying and selling of rare coins. After loading the van, Schmidt Sr. got into the driver's seat, turned on the ignition and waited for Schmidt Jr., who went to lock up their residence.

"As Schmidt Sr. was waiting in the driver's seat, he was suddenly approached by an adult Hispanic male who was pointing a gun in his face and yelling words similar to 'Get out of the car or I'll shoot you.' Mr. Schmidt Sr. heard this phrase shouted three times. The suspect was later positively identified as Danny Jorge Molestina. Fearing for his life, Mr. Schmidt Sr. got out of the driver's seat and relinquished his vehicle to Molestina. As Molestina attempted to enter the van, Mr. Schmidt Sr. attempted to

3

wrestle the gun out of his hand. He failed to disarm Molestina and found the gun once again pointed directly in his face, at which point he backed off. Mr. Schmidt Sr. later described the gun as a small dark colored handgun, possibly a .22 caliber or a 'Saturday Night Special,' to officers.

"When Molestina attempted to get into the driver's seat of the van a second time, Mr. Schmidt Sr. felt that he had another opportunity to try and stop the robbery. He again lunged for the gun, but Molestina placed the van into gear and quickly reversed out of the driveway. Mr. Schmidt Sr. grabbed onto the steering wheel to avoid being run over. He was dragged approximately 18 feet down the driveway and onto the street, until he lost his grip and fell to the pavement. Mr. Schmidt Sr. struck his head and body on the asphalt, while narrowly avoiding being run over by the speeding vehicle.

"Molestina stopped the van momentarily, approximately 50 yards from the residence, to pick up a second suspect. That suspect was later identified as Eduardo Arturo Guerra. Molestina and Guerra drove away in Mr. Schmidt's van, which contained approximately $70,000 worth of property in coins. They were followed by a second vehicle, driven by a suspect later identified as Jorge Antonio Aguila. Mr. Schmidt Sr. called 911 and waited for [Chula Vista Police Department (CVPD)] officers to arrive.

"Mr. Schmidt Jr. informed officers that his cell phone, which was equipped with GPS, was inside of the stolen van. The vehicle was tracked to the 6800 block of Quebec Court in the City of San Diego. Unbeknownst to CVPD, San Diego Police Department [(SDPD)] received a report of a vehicle burglary in progress at that location, after residents observed the suspects unloading items from a white van into a gold Pontiac,

4

which was registered to Aguila. SDPD officers initiated a felony stop of the Pontiac, and Aguila, the driver, was taken into custody at gunpoint. Molestina, the vehicle passenger, jumped out of the vehicle and fled on foot through a condominium complex. Officers gave chase and captured him a short time later. A third suspect was also seen running from the area at the same time, but he was not captured. That suspect may have discarded items of evidence to include a stun gun baton, multiple gloves and a facemask, which were discovered near 6828 Panamint Row. Some of the coins that were stolen during the carjacking were recovered from inside of the Pontiac.

"Mr. Schmidt Sr. and Mr. Schmidt Jr. were both transported to the 6800 block of Panamint Row for a curbside line-up. They both positively identified Molestina as the person who committed the carjacking. Neither man recognized Aguila. They also assisted officers in identifying stolen property, including their van and items seized from the interior of Aguila's Pontiac. Mr. Schmidt Sr. went to the hospital for injuries to his head, back, shoulder, hand and arm.

"Two independent witnesses, who reported the suspected vehicle burglary on Quebec Court to SDPD, positively identified Molestina and Aguila as two of the three individuals that were loading boxes from Mr. Schmidt Sr.'s van into Aguila's Pontiac.

"Molestina and Aguila were arrested for their roles in the carjacking and they were transported to CVPD headquarters for processing. Aguila refused to make a statement. Molestina made a spontaneous statement and declared that he had just been walking around the area and "those guys" offered to pay him $1,000.00 if he helped unload boxes from the van into the Pontiac. Molestina denied being involved in the carjacking.

5

"Search warrants were secured for both of the cellular phones that were confiscated from Molestina and Aguila incident to their arrest. Molestina's phone was found to have made and received several calls to Guerra's cellular phone before, during and after the carjacking. The cellular phone that was located on Aguila's person during his arrest was determined to be owned by Guerra. That phone was discovered to have placed multiple calls to Molestina and Tory Joel Corpening, the defendant, before, during, and after the carjacking. Just prior to the carjacking, Guerra's cell phone received an incoming text message asking, 'Where are you?' Approximately five minutes after the carjacking, a reply was sent from Guerra's phone that read, 'Just working with my crew.'

"On August 12, 2012, Guerra was arrested at the South Bay Courthouse. He was admonished of his rights and admitted participating in the planning and execution of the carjacking. Guerra was the registered owner of a 2001 Ford F150 pickup, the same type of vehicle that witnesses reported was in the area during the carjacking. He identified Corpening as the 'leader' of the group of individuals that committed the crime. Guerra stated that he and Corpening would sell items regularly at the Kobey Swap Meet in San Diego, where Mr. Schmidt Sr. had a booth to buy and sell coins. Guerra and Corpening visited Mr. Schmidt Sr.'s booth on occasion, where they viewed his collection of coins and other currency.

"Guerra reported that Corpening came up with the idea to rob Mr. Schmidt Sr. Corpening assembled a group of individuals together to execute the 'big job.' The group included Molestina, Aguila, and Celestina Maria Rodriguez. Guerra stated that he and Corpening followed Mr. Schmidt Sr. home from the swap meet one day and conducted

6

surveillance on his home prior to committing the instant offense. The group of suspects met in the garage of Corpening's residence the night before the crime occurred and reviewed their plan, which called for Guerra and Aguila to park in front of Mr. Schmidt Sr.'s home in Aguila's Pontiac, while Corpening, Molestina and Rodriguez were to park around the corner in Guerra's F150 truck. Guerra and Aguila were to report to Corpening, via cellular phone, and provide information regarding Mr. Schmidt Sr.'s movements. Corpening was to call Molestina, with the order to commit the actual carjacking, once Mr. Schmidt Sr. was getting ready to leave his residence. The group of suspects drove to the victim's residence, en masse, following their planning meeting to commit the carjacking.

"Guerra admitted he was inside of Aguila's vehicle before, during and after the carjacking. He identified Aguila as the individual who reported Mr. Schmidt Sr.'s movements to Corpening. Upon Corpening's command, Molestina executed the carjacking. After Molestina carjacked Mr. Schmidt Sr.'s vehicle, Corpening jumped in the passenger seat of the stolen van and they drove off. Rodriguez fled the area in Guerra's F150 truck. Guerra and Aguila followed Molestina and Corpening to Quebec Court, where Molestina, Corpening and Aguilar unloaded the stolen items from the van and placed them in Aguila's Pontiac.

"Guerra identified Corpening as the individual who wore a facemask and gloves during the offense. It was likely Corpening whom discarded the facemask, gloves, and stun gun baton that were recovered on Panamint Row. Guerra was able to flee successfully from the scene and made his way back to Corpening's residence. He stated

7

that Corpening appeared there with a box full of rare coins and precious metals. A few days after the carjacking, Guerra, Corpening, and Giana Steina Lupo, Corpening's girlfriend, travelled to Lake Tahoe, where they sold the stolen merchandise to an unknown coin dealer. Lupo was later discovered to have pawned some of Mr. Schmidt Sr.'s coins at a local pawn shop."

## DISCUSSION

The remaining issue to be addressed in this case is whether the trial court erred in imposing a consecutive, one-year sentence for robbery, based upon the contention that the sentence should have been stayed pursuant to section 654. Based upon our review of the record we believe the trial court made an implied finding that the robbery and carjacking were separate acts with different objectives, even though they arose out of the same transaction.

### A. Background

The court imposed a five-year term for the carjacking. It then imposed a consecutive one-year term for robbery (one-third the midterm) and a consecutive eight months for witness intimidation (one-third the midterm). In the People's sentencing memorandum submitted to the trial court the prosecutor recommended the court stay the robbery sentence under section 654. At the time of sentencing the trial court said the following about the robbery sentence:

> "On count two, the robbery, I think [the prosecutor] you wrote in
> your papers that you think that should be 654. I think that it is a
> separate offense with the carjacking. I disagree. I'm going to
> impose one-third the midterm of count two. Midterm is three years.
> One-third is one year. That will be served consecutively."

8

## B. Legal Principles

Section 215, subdivision (c) permits a defendant to be charged with both robbery and carjacking. (*People v. Ortega* (1998) 19 Cal.4th 686, 700.) However, a defendant may not be punished under both statutes for the same act which constitutes a violation of two sections.

Similarly, section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." In order to determine whether there is a single act, or a course of conduct involving multiple violations of statutes requires an examination of the intent or objective of the actor. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.) The real question is whether during a single transaction there is really only one act or one objective. (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

In *Jones, supra*, 54 Cal.4th 350, the court further refined its analysis of section 654. In cases where there is but one physical act, which gives rise to more than one criminal offense, the court held that such act can only be punished once. (*Jones, supra*, at p. 358.) The offenses in *Jones* were firearms violations arising out of one act of possession which could only be punished once. However, where there is a course of conduct, as opposed to a single physical act, the multiple objectives test is still applicable. (*Id.* at pp. 359-360.) The court also observed that in a given case it may be difficult to determine whether the conduct is a single physical act, or a series of physical acts in

9

pursuit of an objective. The court said: "In some situations, physical acts might be simultaneous yet separate for purposes of section 654." (*Jones, supra*, at p. 358.)

The question of whether there were multiple acts or multiple objectives is one of fact. (*People v. Martin* (2005) 133 Cal.App.4th 776, 781.) A trial court's decision as to the existence of multiple objectives is reviewed under the substantial evidence standard of review, whether the finding is express or implied. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731; *People v. Nelson* (1989) 211 Cal.App.3d 634, 638.)

## C. Analysis

These crimes arose from a plot to steal valuable coins from the victim when he left in the early morning for the swap meet. Clearly the objective was to steal the coins and escape. The robbers had two vehicles available to them in order to carry out their scheme. However, their scheme was complicated by the victim's resistance. Ultimately they pushed the victim out of the way and fled in his van. The robbers then abandoned the van a short distance away after taking the coins from the van.

The trial judge specifically rejected the prosecutor's suggestion that section 654 barred multiple punishments for the robbery and the carjacking. The court viewed them as separate offenses, although he applied section 654 to other offenses at sentencing.

There is sufficient evidence in this record from which the court could have concluded there were two intents, close in time. The intent to steal the coins is clear. The court could easily infer the intent to take the van arose as a separate goal of escaping from the crime scene. (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191.)

Accordingly, we find the trial court's implied finding of separate intents or purposes to be supported by substantial evidence.

Corpening relies on *People v. Dominguez* (1995) 38 Cal.App.4th 410, 416-420 (*Dominguez*), to support his argument that section 654 should apply to this case. His reliance on *Dominguez* is misplaced. Although that case involved a carjacking and robbery, the discussion of section 654 in that case has little relevance to the issues in this case.

In *Dominguez* the principal argument for application of section 654 was that there could not be a conviction for both robbery and carjacking. The court rejected that argument and held such dual convictions were permitted. (*Dominguez, supra,* 38 Cal.App.4th at pp. 418-419.) The argument regarding sentences was much different than here. First, the prosecutor there conceded section 654 barred dual punishment. The trial court agreed with that position, however, instead of staying the sentence for robbery, the court imposed it concurrently. Not surprisingly, the court in *Dominguez* ordered the sentence to be stayed.

As we have discussed above, the court in *Jones, supra,* 54 Cal.4th 350, held that only one punishment can be imposed for crimes arising out of one physical act. *Jones*, of course, dealt with the single act of possessing a firearm, which violated several penal code sections. Thus, in that case the defendant could only be punished for one offense, and punishment for the remaining counts had to be stayed pursuant to section 654. Here, the question is whether the actions of the defendant in forcing the victim out of the car, struggling with him as he attempted to resist, then again struggling with the victim, then

11

driving off with the van is but one physical act. Certainly the actions here are far more complex than one act of possessing one firearm and are far more analogous with a finding of a course of conduct, rather than one "physical act."

As we have discussed, the trial court found multiple objectives and multiple acts occurring in the same course of conduct. Corpening and his cohorts were there to steal the coins, not the van. Twice the victim tried to disarm the robber, was forced away and ultimately dragged some distance when he tried to hold onto the steering wheel. It took several discrete physical acts to complete these crimes. The experienced trial court impliedly found different objectives and different physical acts when it expressly rejected the application of section 654 to the robbery count. *Dominguez, supra,* 38 Cal.App.4th 410 and *Jones, supra,* 54 Cal.4th 350, are distinguishable from the facts and procedure presented here. They are of no assistance to the appellant in this case.

DISPOSITION

The conviction for receiving stolen property (count 4) is reversed. In all other respects the judgment is affirmed.


HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


McINTYRE, J.


12