McKINSTER, J.
Defendant and appellant Philip Raymond Mejia appeals his conviction for torture, spousal rape, spousal abuse, and criminal threats. We reject his contention that the court should have conducted a hearing pursuant to People v. Marsden (1970) 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (Marsden ) based on defendant's statements during a hearing on his request to represent himself and his contentions concerning the improper admission of evidence. We agree, however, that the trial court erred in imposing an unstayed sentence on count 3. Accordingly, we will remand the matter with directions to stay imposition of that sentence.
PROCEDURAL HISTORY
Defendant was charged with one count of torture (Pen. Code, § 206 ; count 1);[1] one count of spousal rape with tying and binding *114 (§ 262, subd. (a)(1); count 2); one count of corporal injury to a spouse (§ 273.5, subd. (a); count 3); and one count of criminal threats (§ 422; count 4). As to all four counts, the information alleged that defendant administered methamphetamine to the victim in the commission of the offenses.
A jury returned guilty verdicts on all four counts. It found the allegation of tying and binding true, but found the allegation of administration of methamphetamine not true as to all counts.
The trial court imposed the upper term of four years in state prison on count 3, with a consecutive term of eight months on count 4. On count 2, the court imposed a term of 15 years to life, and on count 1, it imposed a term of seven years to life in state prison. Defendant filed a timely notice of appeal.
FACTS
Defendant and the victim met when she was 15 years old. When she was 18 or 19 years old, they were married. By the time the victim was 20 years old, she had three children. She and defendant used methamphetamine together but stopped when the third child was born. From the beginning, defendant said "mean things" to the victim and would sometimes hit her. In approximately March 2013, when defendant lost his job, his abusiveness slowly got worse. On one occasion, defendant burned her leg with a methamphetamine pipe when she said she did not want to smoke the drug. On another occasion, he hit her all over her body with a wooden flute. Other times, he hit her on her head with his hands.
The victim suspected that defendant had cheated on her, but she "couldn't question what he was doing." Talking back to defendant or not wanting to do what he asked would "set him off." In order to start a conversation about infidelity, she told him, untruthfully, that she had cheated on him. He was angry and talked about punishing her. He said there were "consequences." On other occasions, defendant would handcuff her to the bed frame and make her lie on the floor. They had occasionally used the handcuffs during sex, for "fun purposes," but after that, it "wasn't fun anymore." Defendant would sometimes leave her handcuffed to the bed for hours or days at a time. While she was handcuffed, she was not able to eat or drink water. Defendant would "sometimes" allow her to go to the bathroom, but sometimes she was forced to "go" on herself. The handcuffs sometimes cut or bruised her wrists.
At some point, defendant began to video record their sexual activity. The victim could not remember why it started, but it was after defendant lost his job. She was "kind of okay" with it in the beginning, but sometimes she would get embarrassed and push the cell phone or camera away. At the beginning, there were no handcuffs or abuse, other than defendant "being mean" and telling her what to do. Defendant became increasing abusive, hitting her, using a Taser on her, keeping her from her children and handcuffing her. She had "too many [Taser] marks to count" on her chest and stomach. He "tased" her once while she was tied to a chair.
Defendant taped her to a chair with duct tape and put duct tape over her mouth, making it hard to breathe. On one occasion, she was bent across the chair on her stomach, with her head on the floor. Defendant had intercourse with her while she was bound. She shook her head to indicate that she did not want to, but she could not otherwise protest. He also engaged in anal intercourse with her on some occasions, even though she said she did not want to, because it hurt. Although she sometimes engaged willingly in oral sex, there were *115 times when she did not want to do it, but did anyway so that defendant would not hit her or handcuff her. Defendant would sometimes force her. On one occasion, he sodomized her with a socket wrench.
At one point, defendant cleared the victim's clothes out of the bedroom closet and put a baby mattress on the floor. He would lock her in the closet with a bucket and told her to stay there and not move. He said he was going to have other men come to the house and force her to orally copulate them. He also threatened to sell the videos on YouTube. He threatened to wrap her in a rug and set her on fire. He once threw gasoline on her while she was in the closet. Then he shut her in the closet and left her there for hours. On one occasion, he cut the side of her thigh with a small screwdriver.
At one point, the victim asked defendant to let her kill herself. He tied a rope around her neck and had her stand on a bucket. He kicked the bucket away and let her hang while he was holding the rope. The rope cut her neck.
The victim did not have a key to the couple's apartment. Defendant screwed the front door closed to keep people from coming in. He also added locks to the door. There was also a surveillance camera in the living room.
At least once, defendant hit the victim so hard that she lost consciousness. He revived her by throwing ice on her. On one occasion, he put duct tape on her face, put a wet towel on her face and over her nose, and poured water on her. She could not breathe. Defendant had a device he said was used to strangle a person and threatened to use it on her, to frighten her. He never used it, however.
On August 21, 2013, the victim was late getting the oldest child ready for school. Defendant smacked her with his hand on the back of her head. She then got the middle child ready for school. The defendant took that child to school; the oldest one stayed home. Before defendant left, he hit the victim on the back of the head again and said he would "beat the shit" out of her. However, when he left, he left the door unlocked. She ran to a neighbor's apartment with the two children and called the police. The neighbor said that the victim appeared "petrified." While she was on the phone with the police, she could hear defendant shouting because he could not find her. She had multiple bruises on her face from prior incidents.
The police officer who responded first spoke to the victim and observed her injuries, including burn marks on her stomach. He then entered the couple's apartment. He found a Taser in a drawer in the bedroom, a baggie of methamphetamine in a tool box and handcuffs on the bedroom floor. He also observed a live feed from a camera in the living room, being shown on a television screen. He saw a toddler bed in the closet and observed that the closet locked from the outside.
Detectives who arrived later spoke to the victim and observed that she was extremely thin[2] and had multiple cuts, bruises and abrasions in various stages of healing, and Taser marks on her stomach. In the couple's apartment, the detectives found a strangulation device and handcuffs in the bedroom, a bag of methamphetamine and a methamphetamine pipe, a rope and a gasoline can. They also found several digital flash drives containing videos of various sexual acts.
Thirteen videos were played for the jury. A transcript of the conversations heard on the videos was provided to the jury and admitted into evidence.
*116 In one of the videos, defendant said to the camera, "The reality of it is, is yes, if she does anything stupid I will kill her. Number two, she thinks that camera's a joke. [Its purpose] is to show you, when you fuck with the wrong person, husband, wife, child ... you do the wrong things, there's a consequence sooner or later in life."
At another point, he said, "[I]t was her choice. She chose this okay um ... she has bruises all over her legs. I did that. I did that because I tied her ass up, I beat the shit out of her, I tased her. I fucked her in the ass and I did everything I fuckin' wanted to do and I could have done more because she's a bitch." He told the victim that he was recording the session for YouTube, but "[n]ot the rape, not any of that." He told his "audience" that the victim "may not die" that day, "but you will see what a hostage can and will go through. There's torture, pain, tape, chains, uh knives, needles, water ... a lot of things that ... a person can use to start getting to somebody." He later told her that if she continued to lie to him, he would put her murder on YouTube.
LEGAL ANALYSIS
1.-3.**
4.
SECTION 654 PRECLUDES IMPOSITION OF AN UNSTAYED SENTENCE ON COUNT 3
Defendant contends that section 654 precludes imposition of sentence on both count 1 and count 3, for torture and corporal injury to a spouse, respectively.
Section 654 provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).) Section 654 precludes imposition of an unstayed sentence on the count subject to the lesser punishment. (People v. Mesa (2012) 54 Cal.4th 191, 195, 142 Cal.Rptr.3d 2, 277 P.3d 743.)
This section has long been interpreted to preclude multiple punishments not only for a single act that violates more than one statute, but for an indivisible course of conduct. (People v. Beamon (1973) 8 Cal.3d 625, 639, 105 Cal.Rptr. 681, 504 P.2d 905.) "The key inquiry is whether the objective and intent attending more than one crime committed during a continuous course of conduct was the same. [Citation.]" (People v. Meeks (2004) 123 Cal.App.4th 695, 704, 20 Cal.Rptr.3d 445.) "[I]f all of the offenses were merely incident to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (People v. Harrison (1989) 48 Cal.3d 321, 335, 256 Cal.Rptr. 401, 768 P.2d 1078.) Defendant contends that the sentence on count 3 must be stayed because throughout the three-month period in which he inflicted *117 injuries on the victim, he harbored a single intent, i.e., to cause injury to her. Therefore, he reasons, the acts alleged were part of an indivisible course of conduct.
The Attorney General, on the other hand, likens this case to People v. Perez (1979) 23 Cal.3d 545, 153 Cal.Rptr. 40, 591 P.2d 63 (Perez ). In that case, the defendant was charged with multiple discrete sexual offenses committed during a single 45- to 60-minute episode. (Id . at p. 549, 153 Cal.Rptr. 40, 591 P.2d 63.) The California Supreme Court held that it is simplistic to say that the defendant acted with the single intent and objective of achieving sexual pleasure and that to do so would preclude punishment commensurate with the defendant's actual culpability, in that a person who commits an assault consisting of a single sexual offense is less culpable than a person who commits multiple such acts within the course of a single episode. Moreover, each act was separate and distinct and none of the acts was "incidental to or the means by which" another act was committed, nor did any act facilitate the commission of any other act. (Id . at pp. 552-554, 153 Cal.Rptr. 40, 591 P.2d 63.) Accordingly, the court held, section 654 did not preclude imposition of separate punishments for each sexual act. (Perez , at pp. 553-554, 153 Cal.Rptr. 40, 591 P.2d 63.) In People v. Nubla (1999) 74 Cal.App.4th 719, 88 Cal.Rptr.2d 265, the Court of Appeal applied Perez to multiple acts of violence against a single victim, committed in a single incident. The court held that the defendant could be punished for each count. (Nubla , at pp. 730-731, 88 Cal.Rptr.2d 265.) Based on those two cases, the Attorney General argues that each act of infliction of injury on the victim in this case should be separately punishable under a similar analysis. We disagree that Perez and Nubla govern this case.
Torture can be committed either by a single act or by a course of conduct. (People v. Hamlin (2009) 170 Cal.App.4th 1412, 1429, 89 Cal.Rptr.3d 402.) Where torture is tried as a course of conduct crime, it is not necessary that any single act in the course of conduct results in great bodily injury. Rather, if the requisite intent exists and the cumulative result of the course of conduct is great bodily injury, the crime of torture has been committed. (Ibid . ) This is the theory the prosecutor relied upon in this case.[10] She argued that torture is not necessarily "something that happens with one punch or ... one strangulation, or ... one rape, or one sodomy or one of something." She argued that in this case, the torture consisted of the acts shown on the videos, as well as "how the defendant would kind of C-clamp her throat with his hand and hold her up until she got to the point of unconsciousness and he had to splash water on her face to wake her up, coupled with being punched, being kicked, being tased, not having food, being left locked in a closet. It's all of those things, along with the rapes and the sodomy and all of the forcible crimes. It's an umbrella over all of those things." Because, as the prosecutor argued, the offense of torture by course of conduct consists of multiple discrete acts, all of those acts are the means by which the charged offense was committed. This is different from cases such as Perez , supra , 23 Cal.3d 545, 153 Cal.Rptr. 40, 591 P.2d 63, in which each act, despite being part of a single episode, was separately punishable in part because none of the acts was the means of committing or facilitated the commission of any other offense. ( *118 Id. at pp. 553-554, 153 Cal.Rptr. 40, 591 P.2d 63.) The court also held that this treatment was necessary in order to ensure that the defendant's punishment was commensurate with his actual culpability, i.e., that a person who commits multiple sexual assaults in a single episode is more culpable than a person who commits a single such act. (Id. at p. 553, 153 Cal.Rptr. 40, 591 P.2d 63.) Here, in contrast, the individual acts, taken all together, were the means of committing the charged offense. And, because a conviction for torture results in a term of life imprisonment (§ 206.1), the additional four-year term for corporal injury to a spouse is not necessary to provide punishment commensurate with the defendant's culpability. Accordingly, section 654 precludes imposition of separate sentences on any of the acts that were the components of the course of conduct that constituted torture.[11]
The question, then, becomes whether there is any basis for concluding that the offense charged in count 3 was not a component of the torture course of conduct. Whether a particular offense is part of a course of conduct for purposes of section 654 is a question of fact. (People v. Coleman (1989) 48 Cal.3d 112, 162, 255 Cal.Rptr. 813, 768 P.2d 32.) In the absence of an explicit ruling by the trial court at sentencing, we infer that the court made the finding appropriate to the sentence it imposed, i.e., either applying section 654 or not applying it. (People v. Tarris (2009) 180 Cal.App.4th 612, 626-627, 103 Cal.Rptr.3d 278.) Here, there was no discussion at sentencing as to whether section 654 applied to count 3. Accordingly, we must affirm the sentence if an implied finding that section 654 does not apply is supported by substantial evidence. (Tarris , at pp. 626-627, 103 Cal.Rptr.3d 278.)
As the basis for count 3, the prosecutor apparently relied on the incident on August 21, 2013, the day the victim finally fled. In that incident, defendant "smacked" the victim on the back of her head because she was late getting one of the children ready for school. Examining the evidence in the light most favorable to the trial court's ruling (People v. Tarris , supra , 180 Cal.App.4th at p. 627, 103 Cal.Rptr.3d 278 ), we see no basis for concluding that the final assault was either separated in time from the rest of the acts that constituted torture or was in some other manner distinct from those acts. The victim testified to a lengthy series of physical assaults, and there was no evidence that these assaults had ended before August 21. The victim testified that over several months, defendant hit her for many reasons, including not doing what he wanted her to do. On August 21, the victim still had healing injuries on her face from prior beatings. And, the prosecutor specifically argued that the torture consisted of the more serious acts "coupled with" such acts as defendant hitting and punching the victim. Thus, the record supports only the conclusion that this final act of violence was part of the entire course of conduct that constituted torture.
Moreover, as defendant points out, the jury was instructed that as to counts 2, 3, *119 and 4, the prosecution had presented evidence of more than one act that could constitute the offense and that the jury must either unanimously agree as to the specific act that constituted each offense or must unanimously agree that defendant committed all of the acts alleged to have occurred during the relevant time period. The prosecutor's argument was somewhat ambiguous as to whether count 3 was based on the head slap on August 21. She argued as follows:
"Count 3, corporal injury. The defendant willfully inflicted a physical injury on his spouse; the injury inflicted on the defendant [sic ] resulted in a traumatic condition.
"So what we're talking about there is a punch to the back of the head.... You punch someone in the face, now you've got a black eye. That's the traumatic condition or wound that we're talking about. You stab someone in the leg with a screwdriver, now you've got a hole in your leg. It's any one of those things that she talked about. The way that it's charged, that corporal injury is specifically going to the date of August 21st when she talked about how he was mad at her because she was not getting the kids ready on time and he hit her in the back of the head, told her he was gonna beat her ass when he got back and she had a big bump on the back of her head on the day that she was beat." (Italics added.)
The final sentence indicates that the prosecutor was relying on the August 21 assault as the basis of count 3. Nevertheless, taken all together, the argument is ambiguous as to whether the jury was required to base its verdict on that act. Based on the prosecutor's argument and the unanimity instruction, the jury could have relied on literally any of the acts the victim described as part of the torture course of conduct to find defendant guilty on count 3. Accordingly, the evidence does not support a finding that the act underlying count 3 was in any manner distinguishable from the acts underlying count 1.
DISPOSITION
The cause is remanded with directions to modify the sentence to stay imposition of sentence on count 3 pursuant to Penal Code section 654. The judgment is otherwise affirmed.
CERTIFIED FOR PARTIAL PUBLICATION
We concur:
HOLLENHORST Acting P.J.
SLOUGH J.

All further statutory citations refer to the Penal Code, unless another code is specified.

On August 21, 2013, the victim weighed 82 pounds.

See footnote *, ante .

The information alleged that both count 1 and count 3 took place "on or about August 21, 2013." Nevertheless, the prosecutor made it clear that her theory was that the torture was a three-month course of conduct consisting of multiple acts.

We have found no cases addressing this issue. In People v. Martinez (2005) 125 Cal.App.4th 1035, 23 Cal.Rptr.3d 508, the court held that the individual offenses committed during a course of conduct torture, including infliction of corporal injury on a spouse in violation of section 273.5, subdivision (a), were not necessarily included offenses of the torture count, either by the elements test or the pleading test. Accordingly, the court held, the defendant could be convicted both of torture and of the individual offenses that made up the course of conduct. (Martinez , at pp. 1041-1046, 23 Cal.Rptr.3d 508.) The court did not, however, address a contention that section 654 precluded imposition of unstayed sentences on any of the constituent offenses.