Filed 11/2/20  P. v. Reed CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B299443 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA451382) |
| v. | |
| EDWARD REED | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

A jury convicted Edward Reed of four counts of grand theft under Penal Code section 487, subdivision (a),[1] for Reed's improper receipt of Medi-Cal and Denti-Cal benefits (count 1), services provided through In-Home Supportive Services (IHSS) (count 2), Supplemental Security Income (SSI) (count 3), and Section 8 (42 U.S.C. § 1437f) housing assistance administered through the Housing Authority of the City of Los Angeles (HALAC) (count 4). The jury also convicted Reed of nine counts of perjury (§ 118, subd. (a)) as a result of his HALAC application and annual renewal forms (counts 5 to 13) and found true a special allegation pursuant to section 12022.6, subdivision (a)(2), that he obtained more than $200,000. Reed admitted a prior felony conviction.[2]

The trial court sentenced Reed to 10 years for counts 1 through 4, plus a two-year sentence enhancement required under section 12022.6, for a total of 12 years in state prison. The trial court also sentenced Reed to three years for each perjury count, counts 5 through 13, but stayed each of these sentences under section 654.

On appeal, Reed argues section 654 also required the trial court to stay the sentences on counts 2 through 4.[3] In particular,

---

[1] All unspecified statutory references are to the Penal Code.

[2] The jury also determined the criminal violations alleged in counts 1 through 12, which occurred during the time period between August 2008 through March 26, 2015, were not discovered until August 3, 2015.

[3] Reed raises this argument for the first time on appeal. Failing to raise a section 654 objection in the trial court does not

Reed argues each of these thefts were part of an indivisible course of conduct which he committed pursuant to a single objective: "to obtain taxpayer money that was supposed to go to low-income individuals." We conclude Reed harbored separate objectives in committing each of the four grand thefts, against four different victims, by which he received four distinct government benefits. Accordingly, section 654 does not apply to counts 2 through 4. We thus affirm.

## BACKGROUND

### A.    Reed and Brenda Tuttle[4]

At the time of trial, Reed was a 64-year-old man. He testified he was illiterate and had a third-grade education, although he admitted he had once enrolled in high school.[5] He also testified that he took medication for depression, seizures, and hearing voices and had physical disabilities related to his knees, an ankle, and a wrist.

In 2009, while he was attending Maxine Waters Preparatory School, Reed met Brenda Tuttle. According to their marriage license, they were married on July 9, 2009 in Las Vegas, Nevada. At trial, Reed denied being married to Tuttle and

---

waive this argument for purposes of appeal. (*People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3.)

[4] Reed does not challenge the jury's verdict or the trial court's sentencing on any other basis. We limit our recitation of facts to those relevant to the issues on appeal.

[5] In his 2006 HACLA application, Reed stated he had a fifth-grade education. In his 2009, 2012, 2013, 2014, 2015, 2016, and 2017 HACLA eligibility questionnaires, Reed indicated he had an 11th grade education.

contended he first became aware of the marriage license when Tuttle presented it during their divorce proceedings.[6] During their marriage, Reed and Tuttle did not live together. The family law court granted dissolution of their marriage on May 5, 2016.

During the process of their divorce, Tuttle discovered that on May 31, 2013, Reed had $94,812.42 in a bank account. In 2015, Tuttle provided this information to HACLA. HACLA, in turn, notified Medi-Cal, and Medi-Cal notified the Social Security Administration (SSA).

## B.    Medi-Cal and Denti-Cal Benefits (Count 1)

From 2008 through 2016, Medi-Cal paid $84,374.56 for Reed's medical and dental insurance. At trial, Lisa Meraz-Vasquez, a fraud investigator for the California Department of Health Care Services (DHCS), which oversees Medi-Cal, testified that an individual is not eligible for Medi-Cal if he has more than $2,000 in assets if single or $3,000 if married. She further testified that she obtained Reed's bank records from Wells Fargo, Bank of America, JPMorgan, and Union Bank, and that due to the amount of money in Reed's bank accounts, he was ineligible to receive Medi-Cal or Denti-Cal benefits. The record does not reflect that Reed filed a specific application to obtain Medi-Cal benefits. Meraz-Vasquez testified that an SSI recipient in California is automatically enrolled in Medi-Cal.

## C.    IHSS Benefits (Count 2)

IHSS provides in-home caregiving services to disabled persons who are eligible for Medi-Cal. Although IHSS is a Medi-

---

[6] Reed also testified that Tuttle "asked me to marry her, and I married her," and identified her as his fiancée in a HACLA eligibility questionnaire.

4

Cal program, it is administered by the Los Angeles County Department of Public Social Services (DPSS), and Reed separately applied for IHSS services on or about December 17, 2007. Reed indicated on his application that he was a recipient of SSI or social security pension benefits. According to Meraz-Vasquez, one method to establish eligibility for Medi-Cal, under which IHSS services are provided, was to receive SSI.

Miesha Moss, a social worker for IHSS, worked with Reed for two or three years. Moss testified that IHSS benefits must be renewed annually. As part of the renewal process, IHSS required Reed to submit two forms each year: a recipient/employer responsibility checklist, which is a form provided by the California Department of Social Services; and an applicant/recipient rights and responsibilities, which is a form provided by DPSS.

The first item on the recipient/employer responsibility checklist advised Reed to "[p]rovide required documentation to [his] [s]ocial [w]orker to determine continued eligibility and need for services. Information to report includes, but is not limited to, changes to [his] income, household composition, marital status, property ownership, phone number, and time [he is] away from [his] home." The second form, the applicant/recipient rights and responsibilities, also advised Reed that he must inform his social worker of any changes that may affect his eligibility or need for services. Moss testified she did not only provide the forms to Reed. Rather, she also "verbally [*sic*] explain[ed] to him that he needs to let [IHSS] know any changes that occur whether it's income, household changes," and that before either of them signed the forms, she "ask[ed] if any changes occurred [since] the last time a social worker came out."

5

Reed was not eligible for IHSS services because "he had too much money." Accordingly, Reed received $50,883.22 in caregiving services through IHSS to which he was not entitled.

## D.  SSI (Count 3)

Reed received monthly SSI payments during the period October 2008 through December 2015 and September 2016 through December 2016. At trial, SSA employee Liselda Gutierrez testified that the SSA conducts randomly-selected continuing eligibility reviews. During such reviews, an SSA employee asks the recipient, either in person or by phone, about his or her income, resources, and living arrangements. The SSA employee also advises the recipient both at the beginning and at the end of the interview that the recipient must provide truthful answers under penalty of perjury. SSA memorializes each eligibility review interview in a document called a "redetermination summary," which is provided to the recipient. The redetermination summary also advises the recipient that changes that may affect his or her eligibility for or amount of benefits, such as the value of the recipient's resources exceeding $2,000, must be reported to the SSA within 10 days of occurrence.

Reed participated in such eligibility reviews on June 23, 2011; December 14, 2011; and January 30, 2013. According to the June 23, 2011 redetermination summary, Reed's resources consisted of $10 in cash and $100 in a Bank of America account. According to the December 14, 2011 redetermination summary, Reed's resources consisted of $10 in cash, $375 in a Bank of America account, and $300 in a JPMorgan Chase Bank account. According to Reed's January 30, 2013 redetermination summary, Reed's resources consisted of $10 in cash and $50 in a JPMorgan Chase Bank account.

6

Gutierrez further testified that she was tasked with determining how much SSA had overpaid Reed. To do so, she was provided with Reed's bank account statements. Gutierrez used these statements to identify each month that Reed had funds in his bank accounts in excess of $2,000, making him ineligible for SSI. Gutierrez totaled the payments to Reed during the months that he was ineligible and concluded the SSA overpaid SSI to Reed in the amount of $80,141.28.

## E. HACLA (Count 4) and Perjury on HACLA Applications (Counts 5 to 13)

HACLA receives federal funding that it uses to provide housing benefits to low income individuals. In October 2006, Reed applied to HACLA for housing assistance. The application asked Reed to report any bank accounts. In response, he wrote, "N/A." The application also included a certification, signed by Reed, that all the information Reed provided to HACLA was accurate and complete and that he understood that he had to "report all changes in family composition, income, assets, and expenses of any family member(s)" within 30 days of the change. Further, the certification stated that Reed understood that trying to obtain public housing by providing false information was a crime.

For each year during the period 2007 through 2017, Reed submitted a HACLA eligibility questionnaire that never reported bank account balances greater than $400. Like the original application, each questionnaire required Reed to certify that all the information he provided was accurate and complete; that he would "report any changes in family composition, income, assets, and expenses of any family member(s)" within 30 days; and that he understood trying to obtain public housing by providing false

7

information was a crime.  For each year, 2007 through 2017, Reed signed the certification page.

Notwithstanding these certifications, the evidence at trial demonstrated that at the times Reed submitted the eligibility questionnaires, Reed had significantly more money in his bank accounts.  For example, in March 2013, Reed reported in his eligibility questionnaire that he had $63 in a Chase bank account.  Bank records presented at trial, however, demonstrated that in March 2013, Reed had a bank account with a balance between $60,006.22 to $63,011.57.  HACLA concluded it provided $60,380 in benefits to Reed that he should not have received.

**F.      Verdict and Sentencing**

On August 14, 2018, the jury found Reed guilty of four counts of grand theft of Medi-Cal, IHSS, SSI, and HACLA benefits and nine counts of perjury related to HACLA applications.  The jury also found true the special allegation under section 12022.6 that the thefts were part of a common scheme or plan with losses exceeding $200,000.

Prior to sentencing, Reed admitted his prior felony conviction and moved to strike it.  In his motion to strike the prior felony conviction, Reed argued that persons who committed similar crimes had been given probation if they were able to make monetary restitution.  Reed also argued that because of his age, disability and mental illness, a prison sentence would amount to cruel and unusual punishment.  The trial court denied Reed's motion to strike.

On November 6, 2018, the People filed a supplemental sentencing memorandum in which they argued section 654 did not preclude the imposition of consecutive punishments for each count.  The People also advised the trial court that Reed could be

8

sentenced to a maximum of 31 years and four months and recommended a sentence of 21 years and four months.  Although Reed also filed a sentencing memorandum on June 5, 2019, none of his arguments addressed section 654.

During a sentencing hearing on January 4, 2019, Reed again urged the trial court to impose probation rather than a sentence in state prison and offered to pay $100,000 in restitution.  The trial court indicated that it would take into account Reed paying restitution in sentencing him, and continued the sentencing hearing to allow Reed to make the payment.  In May 2019, Reed paid a total of $100,000 as follows: (1) $30,594.98 to DHCS; (2) $18,450.72 to DPSS; (3) $29,059.96 to SSA; and (4) $21,894.34 to HACLA.

At the July 2, 2019 sentencing hearing, the trial court denied Reed's request to be placed on probation on the basis that "[t]he excessive taking . . . allegation makes him ineligible for probation," and Reed's history did not make him amenable to probation.  Among other things, the trial court stated that Reed "has a lot of trouble with the truth, and it has permeated his life for years."  Further, the trial court explained that Reed has not demonstrated gainful employment and that the $100,000 he used for restitution was likely money he obtained from his "scams."  Therefore, the trial court determined time in state prison was warranted, but also concluded that 21 years was "excessive."

The trial court sentenced Reed to the high term of three years for count 1, on the basis of certain aggravating factors including planning and sophistication.  For the grand theft convictions for counts 2, 3, and 4, the trial court imposed a consecutive one-third the midterm sentence of eight months for each.  The trial court then doubled this five-year sentence due to

9

Reed's prior felony strike and added two years to the sentence based on the section 12022.6 enhancement. The trial court found the perjury counts 5 through 13 were subject to section 654, because the perjury was committed "with the specific goal of perpetuating the thefts; and therefore, they are not subject to being punished separately because they are part of that scheme." Accordingly, the trial court sentenced Reed to a total of 12 years.

Reed timely appealed his sentence.

## DISCUSSION

Reed argues the trial court should have also stayed his sentences for counts 2 through 4 under section 654. Alternatively, Reed argues the sentences on counts 2 and 3 should be stayed because both those counts and count 1 flowed from obtaining SSI. Reed also argues count 2 should be stayed because it had the same named victim as count 1. We conclude section 654 does not apply to any of counts 2, 3 or 4.

## A.    Section 654

Section 654, subdivision (a), states, in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

In interpreting section 654, our Supreme Court explained the touchstone to determining the statute's applicability is the intent and objective of the defendant: " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such

10

offenses but not for more than one.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208, quoting *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)  Thus, "[i]f [a defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective *even though the violations shared common acts or were parts of an otherwise indivisible course of conduct*."  (*People v. Beamon* (1973) 8 Cal.3d 625, 639, italics added.)

However, our Supreme Court also recognized that "[b]ecause of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an 'act or omission,' there can be no universal construction which directs the proper application of section 654 in every instance."  (*People v. Beamon, supra*, 8 Cal.3d at p. 636.)  Accordingly, "a course of conduct divisible in time, although directed to one objective, may [also] give rise to multiple violations and punishment."  (*Id*. at p. 639, fn. 11.)  "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken."  (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

Appellate courts have also found that separate sentences for unlawful acts committed "at different times for different amounts of money [against] different victims . . . is not prohibited by . . . section 654."  (*People v. Lochmiller* (1986) 187 Cal.App.3d 151, 153.)  To treat such crimes as serving one broad objective would be contrary to section 654's " ' "purpose to [e]nsure that a

defendant's punishment will be commensurate with his culpability.  [Citation.]  It would reward the defendant who has the greater criminal ambition with a lesser punishment." ' " (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1116; see *People v. James* (1977) 19 Cal.3d 99, 119 [finding § 654 did not prohibit multiple sentences for breaking into three offices in one building]; *Lochmiller*, *supra*, at pp. 153-154 [finding § 654 does not limit punishment of defendant selling unregistered securities to 11 victims at 10 different times].)

## B.    Standard of Review

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.  [Citations.]  Its findings will not be reversed on appeal if there is any substantial evidence to support them.  [Citations.]"  (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)  However, "the applicability of [section 654] to conceded facts is a question of law."  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  Regardless of whether we apply a substantial evidence or de novo standard of review, we conclude the trial court did not err in its sentencing of Reed.

## C.    The Trial Court Did Not Err in Its Sentencing of Reed

Because Reed did not argue in the trial court that section 654 required the trial court to stay the sentences for counts 2 through 4, the trial court did not make an express ruling on the issue.  The trial court was certainly aware of section 654, however, as it stayed the sentences on counts 5 through 13 under this section.  Thus, implicit in the trial court's sentencing is the determination that Reed's thefts were part of a divisible course of

12

conduct and/or that Reed had several objectives in committing these thefts. (*People v. Beamon*, *supra*, 8 Cal.3d 625.)

The grand thefts articulated in counts 1 through 4 were part of a divisible course of conduct for which Reed had separate objectives. As described in more detail below, during the period 2008 through 2016, Reed committed separate acts at different points of time to obtain and use four types of benefits from four victims. Thus, section 654 does not apply to counts 2 through 4.

The evidence at trial demonstrated that Reed sought to obtain and did obtain four distinct benefits: medical and dental insurance, in-home caregiving services, supplemental income, and housing. To acquire three of these benefits—IHSS, SSI, and HACLA—Reed submitted separate, agency-specific applications on different dates. Reed applied for HACLA benefits in October 2006. Then, over a year later, in December 2007, Reed applied for housing assistance from IHSS. While the record does not contain a separate SSI application, there is no evidence that an IHSS or HACLA application could or did automatically trigger Reed's SSI benefits. Further, Reed's IHSS application indicated that he was an SSI recipient, from which we infer that he had previously applied for SSI. Accordingly, we may reasonably infer Reed separately applied to receive SSI. (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1046 [" '[a]n order is presumed correct; all intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown' "].)

After submitting the initial applications, Reed also participated in separate eligibility renewals for SSI, IHSS, and HACLA with representatives of each government agency on different dates. At trial, Moss testified that IHSS required its recipients to renew their eligibility for their IHSS benefit

13

annually. As part of this renewal process, Reed was required to submit two IHSS-specific forms in which he acknowledged he had to advise his social worker of any changes that would affect his eligibility. For SSI, Reed had an obligation on at least three occasions when SSA conducted an eligibility interview to report his resources to SSA truthfully, but failed to do so notwithstanding his execution of SSA-specific certifications to the contrary. For HACLA, Reed renewed his eligibility nine times, again submitting agency-specific renewal forms, but failed to truthfully report his bank account balances on any of those occasions or at any other time. That Reed committed separate acts to apply for and renew these three public benefits for low income recipients is substantial evidence that he had separate objectives to obtain each of those benefits.

We acknowledge that as an SSI recipient, Reed was automatically *enrolled* to receive medical and dental insurance through Medi-Cal. However, Reed affirmatively used the Medi-Cal and Denti-Cal benefits and thus evinced a separate intent to steal from this program as well.

Our conclusion is also supported by the fact that Reed committed each count of grand theft against separate victims. Specifically, DHCS through its Medi-Cal program paid for Reed's medical and dental benefits. While Medi-Cal provided funds for the IHSS program, it was administered by DPSS. SSA paid SSI to Reed. HACLA provided housing assistance to Reed. As further evidence that these are separate victims, in making partial restitution, Reed issued separate checks made out to DHCS, DPSS, SSA and HACLA. Further, each agency is part of a different level of government: the SSA is a federal agency; Medi-Cal is a state program; IHSS is administered by the County

14

of Los Angeles; and HACLA provides assistance from the City of Los Angeles.[7]

Reed argues he had a common intent and objective: "to obtain taxpayer money that was supposed to go to low-income individuals." We decline to adopt Reed's broad framing of his objective. None of Reed's thefts was merely incidental to another. By way of a contrasting example, Reed's perjury on his HACLA applications and eligibility questionnaires was incidental to his objective to steal housing assistance benefits. He would not have been able to receive the HACLA benefits without this perjury. Thus, the trial court properly stayed the sentences relating to Reed's perjury convictions and properly declined to stay the sentences on counts 2 through 4. To accept Reed's broad definition of his objective and intent would be contrary to section 654's " ' "purpose to [e]nsure that a defendant's punishment will be commensurate with his culpability" ' " and " ' "would reward the defendant who has the greater criminal ambition with a lesser punishment." ' " (*People v. DeVaughn*, *supra*, 227 Cal.App.4th at p. 1116.)

## D. The Jury's Finding that Reed Committed the Thefts Pursuant to a Common Scheme or Plan for Purposes of Section 12022.6 Does Not Affect the Court's Section 654 Analysis

Reed also argues that the jury's finding that the thefts were committed pursuant to a common plan or scheme under section 12022.6 "represents substantial evidence that the thefts were

---

[7] Although the testimony at trial was that IHSS falls under the Medi-Cal umbrella, Reed separately applied for IHSS and each year, renewed his eligibility for IHSS.

part of an indivisible course of conduct that may only be punished once."

Prior to January 1, 2018,[8] section 12022.6 provided: "When any person takes . . . property in the commission . . . of a felony, with the intent to cause that taking . . . , the court shall impose an additional term as follows: [¶] . . . [¶] . . . If the loss exceeds two hundred thousand dollars ($200,000), the court, in addition and consecutive to the punishment prescribed for the felony . . . of which the defendant has been convicted, shall impose an additional term of two years." (*Id.*, subd. (a)(2).) "In any accusatory pleading involving multiple charges of taking . . . , the additional terms provided in this section may be imposed if the aggregate losses to the victims from all felonies exceed the amounts specified in this section and *arise from a common scheme or plan. . . .*" (*Id.*, subd. (b), italics added.)

The People argue that applying section 654 in these circumstances would undermine section 12022.6's purpose to "deter large-scale crime." (*People v. Bowman* (1989) 210 Cal.App.3d 443, 447; see, e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 939 (1991-1992

---

[8] Section 12022.6 included a sunset clause and was repealed by its own terms on January 1, 2018. (§ 12022.6, subd. (f).) In *People v. Medeiros* (2020) 46 Cal.App.5th 1142, 1157, the appellate court concluded that "the text of [section 12022.6] and its legislative history demonstrate with sufficient clarity that the Legislature intended its provisions to apply to defendants who committed their crimes before January 1, 2018." Accordingly, the trial court properly imposed a two-year enhancement in sentencing Reed even though he was sentenced after section 12022.6 was repealed.

Reg. Sess.) ["The purpose of this bill is to deter white collar criminals by imposing additional terms based upon the property loss suffered"].)  We agree.  Where the statute clearly seeks to increase a defendant's punishment for multiple takings with aggregate losses over the prescribed amounts, it would defeat the purpose of both section 12022.6 and section 654 if the enhancement were instead used to lessen a defendant's punishment by invoking section 654.

Moreover, a " 'common scheme or plan' " as used in section 12022.6 is determined by whether the thefts have " 'common features' " that " 'indicate the existence of a plan rather than a series of similar spontaneous acts,' " although the plan " 'need not be distinctive or unusual.' "  (*People v. Green* (2011) 197 Cal.App.4th 1485, 1502.)  Thus, a common plan is not the same as a single act, a single objective, or an indivisible course of conduct.  A defendant may commit separate and distinct acts of theft, even if committed pursuant to a single overarching scheme.  (See *People v. Whitmer* (2014) 59 Cal.4th 733, 741 ["a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme"].)

## DISPOSITION

The trial court's July 2, 2019 order is affirmed.

NOT TO BE PUBLISHED

SINANIAN, J.*

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18